KATZENBACH, ACTING ATTORNEY GENERAL,
ET AL. *v.* McCLUNG ET AL.

No. 543. Argued October 5, 1964.—Decided December 14, 1964.

*Solicitor General Cox* argued the cause for appellants.
With him on the brief were *Assistant Attorney General
Marshall, Ralph S. Spritzer, Philip B. Heymann, Harold
H. Greene* and *Gerald P. Choppin.*

*Robert McDavid Smith* argued the cause for appellees.
With him on the briefs was *William G. Somerville.*

*Jack Greenberg, Constance Baker Motley, James M. Nabrit III* and *Charles L. Black, Jr.*, filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae,* urging reversal.

*T. W. Bruton,* Attorney General of North Carolina, and *Ralph Moody,* Deputy Attorney General, filed a brief for the State of North Carolina, as *amicus curiae,* urging affirmance.

Mr. Justice Clark delivered the opinion of the Court.

This case was argued with No. 515, *Heart of Atlanta Motel* v. *United States,* decided this date, *ante,* p. 241, in which we upheld the constitutional validity of Title II of the Civil Rights Act of 1964 against an attack by hotels, motels, and like establishments. This complaint for injunctive relief against appellants attacks the constitutionality of the Act as applied to a restaurant. The case was heard by a three-judge United States District Court and an injunction was issued restraining appellants from enforcing the Act against the restaurant. 233 F. Supp. 815. On direct appeal, 28 U. S. C. §§ 1252, 1253 (1958 ed.), we noted probable jurisdiction. 379 U. S. 802. We now reverse the judgment.

1. *The Motion to Dismiss.*

The appellants moved in the District Court to dismiss the complaint for want of equity jurisdiction and that claim is pressed here. The grounds are that the Act authorizes only preventive relief; that there has been no threat of enforcement against the appellees and that they have alleged no irreparable injury. It is true that ordinarily equity will not interfere in such cases. However, we may and do consider this complaint as an application for a declaratory judgment under 28 U. S. C. §§ 2201 and 2202 (1958 ed.). In this case, of course, direct appeal to this Court would still lie under 28 U. S. C. § 1252 (1958

ed.).. But even though Rule 57 of the Federal Rules of Civil Procedure permits declaratory relief although another adequate remedy exists, it should not be granted where. a special statutory proceeding has been provided. See Notes on Rule 57 of Advisory Committee on Rules, 28 U. S. C. App. 5178 (1958 ed.). Title II provides for such a statutory proceeding for the determination of rights and duties arising thereunder, §§ 204–207, and courts should, therefore, ordinarily refrain from exercising their jurisdiction in such cases.

The present case, however, is in a unique position. The interference with governmental action has occurred and the constitutional question is before us in the companion case of *Heart of Atlanta Motel* as well as in this case. It is important that a decision on the constitutionality of the Act as applied in these cases be announced as quickly as possible. For these reasons, we have concluded, with the above caveat, that the denial of discretionary declaratory relief is not required here.

2. *The Facts.*

Ollie's Barbecue is a family-owned restaurant in Birmingham, Alabama, specializing in barbecued meats and homemade pies, with a seating capacity of 220 customers. It is located on a state highway 11 blocks from an interstate one and a somewhat greater distance from railroad and bus stations. The restaurant caters to a family and white-collar trade with a take-out service for Negroes. It employs 36 persons, two-thirds of whom are Negroes.

In the 12 months preceding the passage of the Act, the restaurant purchased locally approximately $150,000 worth of food, $69,683 or 46% of which was meat that it bought from a local supplier who had procured it from outside the State. The District Court expressly found that a substantial portion of the food served in the restau-

rant had moved in interstate commerce. The restaurant has refused to serve Negroes in its dining accommodations since its original opening in 1927, and since July 2, 1964, it has been operating in violation of the Act. The court below concluded that if it were required to serve Negroes it would lose a substantial amount of business.

On the merits, the District Court held that the Act could not be applied under the Fourteenth Amendment because it was conceded that the State of Alabama was not involved in the refusal of the restaurant to serve Negroes. It was also admitted that the Thirteenth Amendment was authority neither for validating nor for invalidating the Act. As to the Commerce Clause, the court found that it was "an express grant of power to Congress to regulate interstate commerce, which consists of the movement of persons, goods or information from one state to another"; and it found that the clause was also a grant of power "to regulate intrastate activities, but only to the extent that action on its part is necessary or appropriate to the effective execution of its expressly granted power to regulate interstate commerce." There must be, it said, a close and substantial relation between local activities and interstate commerce which requires control of the former in the protection of the latter. The court concluded, however, that the Congress, rather than finding facts sufficient to meet this rule, had legislated a conclusive presumption that a restaurant affects interstate commerce if it serves or offers to serve interstate travelers or if a substantial portion of the food which it serves has moved in commerce. This, the court held, it could not do because there was no demonstrable connection between food purchased in interstate commerce and sold in a restaurant and the conclusion of Congress that discrimination in the restaurant would affect that commerce.

The basic holding in *Heart of Atlanta Motel,* answers many of the contentions made by the appellees.[1] There we outlined the overall purpose and operational plan of Title II and found it a valid exercise of the power to regulate interstate commerce insofar as it requires hotels and motels to serve transients without regard to their race or color. In this case we consider its application to restaurants which serve food a substantial portion of which has moved in commerce.

3. *The Act As Applied.*

Section 201 (a) of Title II commands that all persons shall be entitled to the full and equal enjoyment of the goods and services of any place of public accommodation without discrimination or segregation on the ground of race, color, religion, or national origin; and § 201 (b) defines establishments as places of public accommodation if their operations affect commerce or segregation by them is supported by state action. Sections 201 (b)(2) and (c) place any "restaurant . . . principally engaged in selling food for consumption on the premises" under the Act "if . . . it serves or offers to serve interstate travelers or a substantial portion of the food which it serves . . . has moved in commerce."

Ollie's Barbecue admits that it is covered by these provisions of the Act. The Government makes no contention that the discrimination at the restaurant was supported by the State of Alabama. There is no claim that interstate travelers frequented the restaurant. The sole question, therefore, narrows down to whether Title II, as applied to a restaurant annually receiving about $70,000 worth of food which has moved in commerce, is a valid exercise of the power of Congress. The Govern-

---

[1] That decision disposes of the challenges that the appellees base on the Fifth, Ninth, Tenth, and Thirteenth Amendments, and on the *Civil Rights Cases,* 109 U. S. 3 (1883).

ment has contended that Congress had ample basis upon which to find that racial discrimination at restaurants which receive from out of state a substantial portion of the food served does, in fact, impose commercial burdens of national magnitude upon interstate commerce. The appellees' major argument is directed to this premise. They urge that no such basis existed. It is to that question that we now turn.

4. *The Congressional Hearings.*

As we noted in *Heart of Atlanta Motel* both Houses of Congress conducted prolonged hearings on the Act. And, as we said there, while no formal findings were made, which of course are not necessary, it is well that we make mention of the testimony at these hearings the better to understand the problem before Congress and determine whether the Act is a reasonable and appropriate means toward its solution. The record is replete with testimony of the burdens placed on interstate commerce by racial discrimination in restaurants. A comparison of per capita spending by Negroes in restaurants, theaters, and like establishments indicated less spending, after discounting income differences, in areas where discrimination is widely practiced. This condition, which was especially aggravated in the South, was attributed in the testimony of the Under Secretary of Commerce to racial segregation. See Hearings before the Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess., 695. This diminutive spending springing from a refusal to serve Negroes and their total loss as customers has, regardless of the absence of direct evidence, a close connection to interstate commerce. The fewer customers a restaurant enjoys the less food it sells and consequently the less it buys. S. Rep. No. 872, 88th Cong., 2d Sess., at 19; Senate Commerce Committee Hearings, at 207. In addition, the Attorney General testified that this type of discrimination imposed "an artificial restriction on the market" and interfered

with the flow of merchandise. *Id.*, at 18–19; also, on this point, see testimony of Senator Magnuson, 110 Cong. Rec. 7402–7403. In addition, there were many references to discriminatory situations causing wide unrest and having a depressant effect on general business conditions in the respective communities. See, *e. g.*, Senate Commerce Committee Hearings, at 623–630, 695–700, 1384–1385.

Moreover there was an impressive array of testimony that discrimination in restaurants had a direct and highly restrictive effect upon interstate travel by Negroes. This resulted, it was said, because discriminatory practices prevent Negroes from buying prepared food served on the premises while on a trip, except in isolated and unkempt restaurants and under most unsatisfactory and often unpleasant conditions. This obviously discourages travel and obstructs interstate commerce for one can hardly travel without eating. Likewise, it was said, that discrimination deterred professional, as well as skilled, people from moving into areas where such practices occurred and thereby caused industry to be reluctant to establish there. S. Rep. No. 872, *supra*, at 18–19.

We believe that this testimony afforded ample basis for the conclusion that established restaurants in such areas sold less interstate goods because of the discrimination, that interstate travel was obstructed directly by it, that business in general suffered and that many new businesses refrained from establishing there as a result of it. Hence the District Court was in error in concluding that there was no connection between discrimination and the movement of interstate commerce. The court's conclusion that such a connection is outside "common experience" flies in the face of stubborn fact.

It goes without saying that, viewed in isolation, the volume of food purchased by Ollie's Barbecue from sources supplied from out of state was insignificant when

compared with the total foodstuffs moving in commerce. But, as our late Brother Jackson said for the Court in *Wickard* v. *Filburn*, 317 U. S. 111 (1942):

> "That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." At 127–128.

We noted in *Heart of Atlanta Motel* that a number of witnesses attested to the fact that racial discrimination was not merely a state or regional problem but was one of nationwide scope. Against this background, we must conclude that while the focus of the legislation was on the individual restaurant's relation to interstate commerce, Congress appropriately considered the importance of that connection with the knowledge that the discrimination was but "representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce." *Polish Alliance* v. *Labor Board*, 322 U. S. 643, 648 (1944).

With this situation spreading as the record shows, Congress was not required to await the total dislocation of commerce. As was said in *Consolidated Edison Co.* v. *Labor Board*, 305 U. S. 197 (1938):

> "But it cannot be maintained that the exertion of federal power must await the disruption of that commerce. Congress was entitled to provide reasonable preventive measures and that was the object of the National Labor Relations Act." At 222.

5. *The Power of Congress to Regulate Local Activities.*

Article I, § 8, cl. 3, confers upon Congress the power "[t]o regulate Commerce . . . among the several States" and Clause 18 of the same Article grants it the power

"[t]o make all Laws which shall be necessary and proper
for carrying into Execution the foregoing Powers . . . ."
This grant, as we have pointed out in *Heart of Atlanta
Motel* "extends to those activities intrastate which so
affect interstate commerce, or the exertion of the power
of Congress over it, as to make regulation of them appro-
priate means to the attainment of a legitimate end, the
effective execution of the granted power to regulate inter-
state commerce." *United States* v. *Wrightwood Dairy
Co.,* 315 U. S. 110, 119 (1942). Much is said about a
restaurant business being local but "even if appellee's
activity be local and though it may not be regarded as
commerce, it may still, whatever its nature, be reached
by Congress if it exerts a substantial economic effect on
interstate commerce . . . ." *Wickard* v. *Filburn, supra,*
at 125. The activities that are beyond the reach of Con-
gress are "those which are completely within a particular
State, which do not affect other States, and with which
it is not necessary to interfere, for the purpose of exe-
cuting some of the general powers of the government."
*Gibbons* v. *Ogden,* 9 Wheat. 1, 195 (1824). This rule is
as good today as it was when Chief Justice Marshall laid
it down almost a century and a half ago.

This Court has held time and again that this power
extends to activities of retail establishments, including
restaurants, which directly or indirectly burden or ob-
struct interstate commerce. We have detailed the cases
in *Heart of Atlanta Motel,* and will not repeat them
here.

Nor are the cases holding that interstate commerce ends
when goods come to rest in the State of destination appo-
site here. That line of cases has been applied with refer-
ence to state taxation or regulation but not in the field of
federal regulation.

The appellees contend that Congress has arbitrarily
created a conclusive presumption that all restaurants

meeting the criteria set out in the Act "affect commerce." Stated another way, they object to the omission of a provision for a case-by-case determination—judicial or administrative—that racial discrimination in a particular restaurant affects commerce.

But Congress' action in framing this Act was not unprecedented. In *United States* v. *Darby*, 312 U. S. 100 (1941), this Court held constitutional the Fair Labor Standards Act of 1938.[2] There Congress determined that the payment of substandard wages to employees engaged in the production of goods for commerce, while not itself commerce, so inhibited it as to be subject to federal regulation. The appellees in that case argued, as do the appellees here, that the Act was invalid because it included no provision for an independent inquiry regarding the effect on commerce of substandard wages in a particular business. (Brief for appellees, pp. 76–77, *United States* v. *Darby*, 312 U. S. 100.) But the Court rejected the argument, observing that:

> "[S]ometimes Congress itself has said that a particular activity affects the commerce, as it did in the present Act, the Safety Appliance Act and the Railway Labor Act. In passing on the validity of legislation of the class last mentioned the only function of courts is to determine whether the particular activity regulated or prohibited is within the reach of the federal power." At 120–121.

Here, as there, Congress has determined for itself that refusals of service to Negroes have imposed burdens both upon the interstate flow of food and upon the movement of products generally. Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators, in

---

[2] 52 Stat. 1060, 29 U. S. C. § 201 *et seq.* (1958 ed.).

light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end. The only remaining question—one answered in the affirmative by the court below—is whether the particular restaurant either serves or offers to serve interstate travelers or serves food a substantial portion of which has moved in interstate commerce.

The appellees urge that Congress, in passing the Fair Labor Standards Act and the National Labor Relations Act,[3] made specific findings which were embodied in those statutes. Here, of course, Congress has included no formal findings. But their absence is not fatal to the validity of the statute, see *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152 (1938), for the evidence presented at the hearings fully indicated the nature and effect of the burdens on commerce which Congress meant to alleviate.

Confronted as we are with the facts laid before Congress, we must conclude that it had a rational basis for finding that racial discrimination in restaurants had a direct and adverse effect on the free flow of interstate commerce. Insofar as the sections of the Act here relevant are concerned, §§ 201 (b)(2) and (c), Congress prohibited discrimination only in those establishments having a close tie to interstate commerce, *i. e.,* those, like the McClungs', serving food that has come from out of the State. We think in so doing that Congress acted well within its power to protect and foster commerce in extending the coverage of Title II only to those restaurants offering to serve interstate travelers or serving food, a substantial portion of which has moved in interstate commerce.

The absence of direct evidence connecting discriminatory restaurant service with the flow of interstate food,

---

[3] 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* (1958 ed.).

a factor on which the appellees place much reliance, is not, given the evidence as to the effect of such practices on other aspects of commerce, a crucial matter.

The power of Congress in this field is broad and sweeping; where it keeps within its sphere and violates no express constitutional limitation it has been the rule of this Court, going back almost to the founding days of the Republic, not to interfere. The Civil Rights Act of 1964, as here applied, we find to be plainly appropriate in the resolution of what the Congress found to be a national commercial problem of the first magnitude. We find it in no violation of any express limitations of the Constitution and we therefore declare it valid.

The judgment is therefore

*Reversed.*

[For concurring opinion of MR. JUSTICE BLACK, see *ante,* p. 268.]

[For concurring opinion of MR. JUSTICE DOUGLAS, see *ante,* p. 279.]

[For concurring opinion of MR. JUSTICE GOLDBERG, see *ante,* p. 291.]