**Russell W. WHITE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 19014.**

United States Court of Appeals
Eighth Circuit.

July 9, 1968.

Henry G. Morris, St. Louis, Mo., for appellant.

Joanne S. Sisk, Atty., Dept. of Health, Education & Welfare, Washington, D. C., for appellee; William W. Goodrich, Asst. Gen. Counsel, Dept. of Health, Education & Welfare, Washington, D. C., and Veryl L. Riddle, U. S. Atty., for the Eastern District of Missouri, and Irvin L. Ruzicka, Asst. U. S. Atty., for the Eastern District of Missouri, on the brief.

Before VAN OOSTERHOUT, Chief Judge, BLACKMUN, Circuit Judge, and VAN PELT, District Judge.

VAN PELT, District Judge.

This is an appeal by the defendant, a medical doctor, from a conviction had in the District Court of the United States for the Eastern District of Missouri. The information on which defendant was tried consisted of nine counts. Six counts charged defendant with selling and delivering to a government agent a quantity of amphetamine hydrochloride powder, a "depressant or stimulant drug" within the meaning of 21 U.S.C.A. § 321(v) (2) in violation of

21 U.S.C.A. § 331(q) (2). Count VII alleges the government agent was one other than the one referred to in Count V. In Count III he was charged with selling and delivering to a government agent a number of d-amphetamine sulfate capsules, and in Counts VI and VIII with selling and delivering a number of secobarbital sodium capsules to a government agent in violation of the same statutory provision. The government agent referred to in Count VIII was said to be a government agent other than the one referred to in Count VI. The jury found defendant guilty on all nine counts. He was thereafter sentenced to imprisonment for one year upon each of the nine counts, with the sentences on the last eight counts running concurrently with the sentence on the first count. Consequently, if conviction on any one of the counts can be sustained, then the judgment of the trial court must be affirmed.

This case arises under the Drug Abuse Control Amendments of 1965 of the Federal Food, Drug and Cosmetic Act. 21 U.S.C.A. § 331(q) (2), the section under which the appellant was convicted, provides:

"The following acts and causing thereof are prohibited; * * * the sale, delivery, or other disposition of a drug in violation of section 360a(b) of this title * * *."

Section 360a(b) provides:

"No person, other than—

(1) a person described in subsection (a) of this section, while such person is acting in the ordinary and authorized course of his business, profession, occupation, or employment, * * * shall sell, deliver, or otherwise dispose of any depressant or stimulant drug to any other person."

"Depressant or stimulant drug" is defined in the Act as:

" * * * (1) any drug which contains any quantity of (A) barbituric acid or any salts of barbituric acid; or (B) any derivative of barbituric acid which has been designated by the Secretary under section 352(d) of this title as habit forming.

(2) any drug which contains any quantity of (A) amphetamine or any of its optical insomers; (B) any salt of amphetamine or any salt of an optical insomer of amphetamine * * *." 21 U.S.C.A. § 321(v).

Section 360a(b) (1), with its reference to "a person described in subsection (a) of this section" is relevant to the present case and will be discussed later in connection with the appellant's contention that because he is a licensed medical practitioner he is exempt from the provisions of the Act, or if not per se exempt, then the conduct which was found to be in violation of § 331(q) (2) is not within the purview of the Act.

The drugs involved in the present action are amphetamine hydrochloride, d-amphetamine sulfate, and secobarbital sodium. The latter, secobarbital sodium, is defined as a derivative of barbituric acid in 21 C.F.R. 165.1, and thus comes under the provisions of section 321(v) (1). These regulations, in accordance with Archambault v. United States, 224 F.2d 925, 928 (10 Cir. 1955), have the "force and effect of law." Thus, all of the drugs here involved are clearly within the definition of "depressant or stimulant drug" as defined in § 321(v).

The events that lead to the eventual conviction of the appellant began on January 20, 1967. On that date, Clifford C. Elliott, an agent for the Bureau of Drug Abuse Control, United States Food and Drug Administration, using the name of "George Harris", accompanied one Bruce Blackburn to the appellant's office. The two men arrived at 8 P.M. and were eventually met there by Doctor White, the appellant. Blackburn introduced "Harris" to Doctor White and told the Doctor that "Harris" wanted a prescription for powder like he, Blackburn, had gotten. Appellant wrote a prescription for two ounces of amphetamine hydrochloride powder. Appellant seems to concede, at page 3 of his brief, that he asked no questions concerning

the state of "Harris'" health; however, on page 8 of his brief, the appellant cites his own testimony at the trial in an attempt to establish that a physician-patient relationship had been created. This testimony was denied at the trial by agent Elliott. The verdict indicates the jury believed Elliott and disbelieved appellant.

On January 25, 1967, Elliott and Blackburn returned to the appellant's office where Elliott again requested a prescription for two ounces of amphetamine hydrochloride. The appellant wrote this prescription, and a separate prescription for 10 milligram dexedrine capsules.

On February 7, 1967, Elliott went to the appellant's office alone and received a prescription for three ounces of amphetamine hydrochloride for himself and an identical prescription for Bruce Blackburn. On February 14, 1967, Elliott accompanied by Agent Willard Rutledge, went to Doctor White's office where Rutledge was introduced by Elliott to White as an old friend. Elliott was given a prescription for four ounces of amphetamine hydrochloride. Rutledge was given a similar prescription. There is dispute as to whether the doctor made any inquiry into the state of Rutledge's health.

Elliott then asked Doctor White for some "red birds" and was given a prescription for 36 Seconal one and one-half grain capsules.[1] Agent Rutledge then asked the appellant whether the Seconal would help one sleep, to which Doctor White replied in the affirmative. Rutledge then asked for some Seconal for his "girl friend", one Susan Jones, who was, so far as Rutledge knew, non-existent. Doctor White wrote the prescription for "Susan Jones" who was not present in the doctor's office. Thus, it is quite apparent that a physician-patient relationship was never established between Doctor White and the non-existent "Susan Jones". The "Susan Jones" transaction is Count VIII.

One additional visit was made to appellant's office by Elliott. This was on February 16, 1967. Elliott requested and received identical prescriptions for himself and for his "buddy, Bruce, the one armed fellow." Each prescription was for four ounces of amphetamine hydrochloride. Agent Elliott, as on all of the previous transactions, paid money to the appellant at the time he received the prescription.

The claimed errors can be classified as relating

a) to the failure to charge or prove that the drugs had moved or were transported in interstate commerce;

b) error in receipt of exhibits;

c) error in permitting witness Burton to give opinion evidence; and

d) error relating to defendant's rights as a doctor of medicine.

We shall take up first the claim relating to defendant's status. Without dispute, we find as stated on pages 7 and 8 of appellant's brief, the defendant is "68 years of age (colored), a doctor of medicine, residing at 3942 Cote Brilliante and having an office at 1524 North Sarah Street, was also employed on the staff of the Homer Phillips Hospital in St. Louis (Tr. 103)."

It is the claim of appellant that being a doctor of medicine, he was legally authorized to write prescriptions for the drugs referred to in Counts I through IX and that the statute prescribes no formula as to the amount of such drugs he could prescribe. He thus claims that the case should never have been submitted to the jury, who were instructed:

" * * * that the defendant, a doctor of medicine, is exempt from the provisions of the Pure Food and Drug Act, if you find that he wrote prescriptions for the persons referred to in the evidence in the course of his professional practice; that the law permits the defendant, being a doctor of medicine, to write prescriptions for the drugs referred to in the evidence, and unless you find and believe that he did not prescribe the drugs in the course of

---

1. Seconal is another name for secobarbital sodium. 21 C.F.R. § 165.1.

his professional practice, then you must acquit him.

"You are further instructed that under the statute, a physician is exempted from the prohibition against the sale and delivery, or the causing of the sale or delivery of depressant or stimulant drugs only when he acts in the ordinary and authorized course of his practice."

The language used by the court in the charge is taken nearly verbatim from 21 U.S.C.A. § 360a(b), which provides in part

"(b) No person, other than—

(1) a person described in subsection (a) of this section, while such person is acting in the ordinary and authorized course of his business, profession, occupation, or employment, * * * shall sell, deliver, or otherwise dispose of any depressant or stimulant drug to any other person."

and from 21 U.S.C.A. § 360a(a) (4), describing the persons to whom the Act does not apply, reading:

"(4) Practitioners licensed by law to prescribe or administer depressant or stimulant drugs, while acting in the course of their professional practice."

Based on these sections, appellant contends that he is entitled to dispense these drugs fully and without restriction.

■ That a doctor acting within the scope of his professional practice was to be unimpeded in his actions by this Act is not doubted. On the other hand, to claim that Congress did not intend to exercise some degree of control over a class of our society which has almost unlimited access to the drugs sought to be controlled, and whose members would be in a position to abuse the attempted congressional control is contrary to the history of the Act.[2] We must determine whether an individual who is licensed to practice medicine, and thereby authorized to prescribe for use stimulant or depressant drugs, but who peddles prescriptions without regard to the health or safety of the individual to whom the prescription is given, and with profit as a motive, is acting within the course of professional practice.

A reading of the Act indicates that Congress fully intended to restrict the conduct of one licensed to prescribe or administer depressant or stimulant drugs. Both section 360a(a) (4) and section 360a(b) (1) have limiting clauses. The two sections read together, as they must be, provide that a practitioner licensed by law to prescribe or administer depressant or stimulant drugs while such person is acting in the ordinary and authorized course of his profession may administer and prescribe the drug. Thus, the limitation imposed upon the appellant is that he be acting in the ordinary and authorized course of his profession. The trial court charged the jury in accordance with this language. The jury found the conduct of the appellant wanting, and, in light of the testimony, it is difficult to disagree with the finding of the jury.

■ In Brown v. United States, 250 F.2d 745 (5 Cir. 1958), certiorari denied, 356 U.S. 938, 78 S.Ct. 779, 2 L.Ed.2d 812, rehearing denied 357 U.S. 933, 78 S.Ct. 1368, 2 L.Ed.2d 1376 (1958), a practicing physician in Dumas, Texas, who sold dextro-amphetamine hydrochloride to two Federal Agents whom he supposed to be truck drivers, was convicted. It was found that prior to dispensing the drugs the appellant had not prepared or given either of them a prescription and had not examined the physical condition of either, nor had he attempted in any way to acquaint himself with the health or needs of either man. The fact that in

2. H.R.Rep. 130, to accomp. H.R. 2, 89th Cong., 1st Sess., p. 2 (1965); S.Rep. 337, to accomp. H.R.Rep. 2, 89th Cong., 1st Sess., p. 1; 111 Cong.Rec. 4577 states: "There is no level in the entire chain of distribution from manufacturer to consumer which does not today serve as a source of supply of depressant and stimulant drugs for the illicit traffic. * * * Some physicians and other licensed practitioners have also been involved in illicit diversions of these drugs."

*Brown* the pills were sold directly, and in the present case it is prescriptions that were sold is immaterial. Manning v. United States, 31 F.2d 911 (8 Cir. 1929). Although the appellant in *Brown,* supra, was not charged under the same section of the Act as Doctor White is charged, nevertheless, the defense in *Brown* was based upon a belief that the provisions of the Federal Food, Drug and Cosmetic Act did not apply to the dispensing of drugs by a licensed physician. The court held this defense untenable, stating that while no cases dealing with a licensed physician had been reported, that the Court of Appeals for the Tenth Circuit had affirmed a conviction of a person who had held himself out to be a physician, but who had not obtained a medical license. Archambault v. United States, 224 F.2d 925 (10 Cir. 1955). The court then referred to the case of United States v. Amin Boutros (D.C.W.D.Mo.), No. 19,304 Cr. decided December 23, 1955. Judge Whittaker, later Mr. Justice Whittaker, said in effect, when sentencing the defendant: that a license to practice medicine was not a license to peddle pills; that a doctor must make an examination of one who has come to him in his medical capacity; and an intelligent determination that a particular barbiturate would be beneficial to the person who has sought the aid of the doctor must be made; only then does the doctor have the right to issue a prescription for such a person. In other words, it appears that Mr. Justice Whittaker was of opinion that as a prerequisite to the issuance of a prescription for the drug a bona fide physician-patient relationship must exist. Regardless of the merits of the dispute as to the existence of such a relationship between Agents Elliott and Rutledge and the appellant, no possible relationship of any sort, professional or otherwise, could have existed between the appellant and the non-existent "Susan Jones", as to whom defendant was told she was Rutledge's "girl friend" (Tr. p. 48). Thus, the conviction as to Count VIII must stand even if a professional relationship existed between the Doctor and the two government agents.

It would also appear that the jury was justified in finding from the evidence that a professional relationship did not exist between Doctor White and either Agent Elliott or Agent Rutledge. As the Supreme Court of the United States, in an analogous situation, indicated in answer to a certified question of the Sixth Circuit Court of Appeals in Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497 (1919), which involved the Harrison Act, the word "prescription" does not include the doctor issuing an order for morphine for the purpose of providing the user with a sufficient amount to keep him comfortable by maintaining his customary use. Such conduct the Court held was not a prescription and it would be a perversion of the word to consider it as such. A like argument could be made in regard to the alleged "physician-patient" relationship in this case. Appellant (p. 3 of his brief) seems to concede that none existed as to the January 20th transaction. "Dr. White asked no questions concerning his state of health (Tr. 15)." In accord with the decision in *Brown,* supra, are State v. Bridges (Mo.), 398 S.W.2d 1 (1966); and De Freese v. United States, 270 F.2d 730 (5 Cir. 1959).

Support for this conclusion is found in Jin Fuey Moy v. United States, 254 U.S. 189, 194, 41 S.Ct. 98, 65 L.Ed. 214 (1920), which also involved the Harrison Anti-Narcotic Act. The Court stated:

> "Manifestly the phrases 'to a patient' and 'in the course of his professional practice only' are intended to confine the immunity of a registered physician, in dispensing the narcotic drugs mentioned in the act, strictly within the appropriate bounds of a physician's professional practice, and not to extend it to include a sale to a dealer or a distribution intended to cater to the appetite or satisfy the craving of one addicted to the use of the drug."

See also, Nigro v. United States, 117 F.2d 624 (8 Cir. 1941); and Manning v. United States, 31 F.2d 911, 913 (8 Cir. 1929).

▮ Manifestly, sections 360a(b) (1) and 360a(a) (4) limit the immunity of a licensed practitioner. It is apparent that such a practitioner is not immune from the Act solely because of his status; it is also apparent that a doctor who prescribed Seconal for a girl, and gives this prescription to her boy friend without ever having seen the girl before writing the prescription is not acting in the ordinary and authorized course of his profession.

Appellant also contends that the trial court erred in receiving certain testimony of Dr. Burton, Associate Professor of Pharmacology, Washington University Medical Center, St. Louis, Missouri. Appellant complains of Dr. Burton's testimony on two grounds: one, that he gave his opinion on ultimate issues of fact, namely, the criteria for a doctor-patient relationship; two, that the nature of Dr. Burton's testimony was for a medical expert and not for a layman.

▮ With regard to Dr. Burton's qualifications as an expert, this court is committed to the rule that the qualifications of an expert and the question of whether expert opinion upon the subject matter should be permitted are questions which ordinarily should be determined by the trial court in the exercise of sound discretion. This court has frequently said that it will not reverse a trial court upon any ruling upon evidence unless the error is shown to be prejudicial. See Rhynard v. Filori, 315 F.2d 176 (8 Cir. 1963); Jones v. Goodlove, 334 F.2d 90 (8 Cir. 1964); Joseph A. Bass Co. v. United States, 340 F.2d 842 (8 Cir. 1965); and Harris v. Smith, 372 F.2d 806 (8 Cir. 1967).

Dr. Burton is an Associate Professor of Pharmacology at Washington University Medical School. He received a Bachelor of Science degree from both the University of Maryland and Georgetown University. He earned his Doctor of Philosophy degree at Johns-Hopkins in Baltimore. Before coming to the Washington University Medical School, he was employed for approximately five years at the National Institute of Health in Bethesda, Maryland, and, at the time of the trial, had been on the staff of the Washington University Medical School for ten years. Dr. Burton is a member of numerous professional societies and has published over fifty major articles in his field. He is employed to train medical students specifically in the area of drug use. Dr. Burton is clearly an expert by any standard to be applied. The question is whether he is an expert in the field in which he testified at the trial.

Dr. Burton defined pharmacology as the study "of mechanism, the ways in which drugs exert their beneficial action and also the ways and mechanisms in which they exert their harmful actions." It is reasonable to assume that he teaches his students about the advantages and disadvantages of drug usage. In fact he implied as much in his response to the question to which the appellant objected. The following is the evidence, the receipt of which is claimed to be error:

"Q. Speaking as a pharmacologist training medical students to be physicians, Doctor, what kind of relationship in your opinion do you consider necessary between a doctor and patient before the doctor prescribes drugs?

Mr. Morris: We object to that as calling for a conclusion. It would depend upon each individual case. I object to it as immaterial, irrelevant and immaterial.

The Court: Be overruled.

Q. (By Mr. Ruzicka) You may answer.

A. We teach the medical students that they should know their patient quite thoroughly both through conversation, through the physical examination, when necessary through various laboratory tests, because they need to know what is wrong with the patient before they can adequately and safely

use drugs in the treatment. They need to know the patient in addition because many of the drugs they use have side effects which are deleterious. Even very common drugs, drugs such as aspirin, can be a life threatening drug in the right situation, or the wrong situation, I guess."

It would seem that one whose area of expertise is the study of the beneficial and harmful effects of drugs within the human body is in an especially advantageous position to testify as to the relationship which should exist between a doctor and patient, or what a doctor should know about his patient before prescribing a particular drug. He, as a student of drugs, can evaluate their potential effect in the human body. His testimony is along a line not generally known to laymen and jurors. Consequently, Dr. Burton is a proper expert and his testimony was within the range of his expertise. The trial court did not abuse its discretion. This court has recently held that a general medical practitioner can express his opinion as to proper treatment in the field of orthopedics although he is not an orthopedic surgeon. See Harris v. Smith, 8 Cir., 372 F.2d 806.

Appellant also objected to Dr. Burton's testimony concerning whether amphetamine hydrochloride should be prescribed without the doctor seeing the patient. Appellant states that this testimony invades the province of the jury. In the light of Rhynard v. Filori, 315 F.2d 176 (8 Cir. 1963), this position is unsupportable. There the court stated that it adopted the view that expert witness testimony is not vulnerable to an objection that it invades the province of the jury. This position was reiterated in Jones v. Goodlove, 334 F.2d 90 (8 Cir. 1964).

Appellant also objects that the testimony of Dr. Burton was an opinion on ultimate issues of fact and not within his area of expertise. He cites Riley v. United States, 96 U.S.App.D.C. 258, 225 F.2d 558 (1955). As was stated above, Dr. Burton is an expert, and did testify in his area of special competency. Judge Bazelon, who wrote the opinion for the court in *Riley*, supra, stated that even where the expression of opinion by an expert closely touched the ultimate issue which the jury has to determine, it is admissible so long as it relates to matters within the witness' special competence and skill and not to matters of common knowledge and observation. This rule fits the present case precisely, for the testimony of Dr. Burton was within his special competence and was not a matter of common knowledge or observation.

Error is claimed

"(d) The Government exhibits were incompetent and immaterial as they did not tend to prove the violation of any federal criminal law." (Appellant's brief, p. 12)

No particular exhibits are mentioned to which this claimed error applies. The court has examined the exhibits consisting mainly of the prescriptions issued by defendant and the drugs purchased by reason of the prescriptions. The foundation for each seems adequate. They are material and relevant to the charge made against defendant. This claim of error is rejected.

Appellant urges that the judgment and conviction should be reversed because there was no allegation in the information or evidence offered at the trial that the drugs referred to in the information had moved or were transported in interstate commerce. Because of this claimed defect, it is contended that the trial court lacked jurisdiction. Appellant claims that 21 U.S.C.A. § 331 (q) (2) requires that the drugs move in interstate commerce. The United States concedes that the information contains no such allegation but urges that no such showing is required under § 331 (q) (2). The question so presented of whether or not 21 U.S.C.A. § 331(q) (2) requires a showing that the drugs involved and prescribed by Doctor White had previously moved in interstate com-

merce must be decided contrary to appellant.

Appellant argues from other provisions of the Act that refer specifically to "interstate commerce" that § 331(q) (2) must also require interstate transportation. Appellant cites section 333, which provides penalties for violation of section 331. Part (c) of section 333 states:

"No person shall be subject to the penalties of subsection (a) of .this section, (1) for having received in interstate commerce any article and delivered it or proffered delivery of it, if such delivery or proffer was made in good faith * * *; or (2) for having violated section 331(a) or (d) of this title * * *; or (4) for having violated section 331(b), (c) or (k) of this title by failure to comply with section 352(f) of this title in respect to an article received in interstate commerce * * *."

From this passage the appellant concludes that § 331(q) (2) requires an interstate movement because § 331(b) and (c), which deal with shipping and receiving adulterated and misbranded drugs in interstate commerce, requires interstate movement. It does not follow, however, that because parts of § 331 require the drug to move in interstate commerce that all of the parts of § 331 require the particular drug to move in interstate commerce before the Act has been violated. To the contrary, § 331 (q) (2) makes no mention of interstate commerce. The reason it does not is set forth in the "Congressional Findings and Declaration of Policy," reported in Section 2 of the Amendments, Public Laws 89–74, 79 Stat. 226, and also in the Notes following 21 U.S.C.A. Sec. 360a, p. 151 of the 1967 Cumulative Annual Pocket Part. There we read:

"The Congress hereby finds and declares that there is a widespread illicit traffic in depressant and stimulant drugs moving in or otherwise affecting interstate commerce; that the use of such drugs, when not under the supervision of a licensed practitioner, often endangers safety on the highways (without distinction of interstate and intrastate traffic thereon) and otherwise has become a threat to the public health and safety, making additional regulation of such drugs necessary regardless of the intrastate or interstate origin of such drugs; that in order to make regulation and protection of interstate commerce in such drugs effective, regulation of intrastate commerce is also necessary because, among other things, such drugs, when held for illicit sale, often do not bear labeling showing their place of origin and because in the form in which they are so held or in which they are consumed a determination of their place of origin is often extremely difficult or impossible; and that regulation of interstate commerce without the regulation of intrastate commerce in such drugs, as provided in this Act (see Short Title note under this section), would discriminate against and adversely affect interstate commerce in such drugs."

Quite obviously, Congress had no intention of requiring that a violation of § 331(q) (2) be predicated upon a showing that the drugs be moved in interstate commerce prior to the time of the conduct proscribed by the above section. United States v. Freeman, 275 F.Supp. 803 (N.D.Ill.1967).

In *Freeman*, the defendant was charged with knowingly selling and possessing methamphetamine powder, a "depressant or stimulant drug" within the meaning of 21 U.S.C.A. § 321(v) in violation of § 331(q) (2) and (3). In reference to the Drug Abuse Control Amendments of 1965, which included section 331(q) (2), the court stated: "As defendant points out, the Amendments do not require a showing that the drugs involved in a particular transaction moved in interstate commerce." There is nothing in the Act itself, or in the legislative history that indicates that § 331(q) (2) applies only to drugs which have moved in interstate commerce. Actually, it indicates that a contrary result

was intended by the Congress. Consequently, we hold that § 331(q) (2) does not require a showing that the drugs involved in a particular transaction have moved in interstate commerce. To hold otherwise would be to disregard the express policy declarations of the Congress.[3]

Appellant cites numerous cases dealing with other parts of the Act: De Freese v. United States, 270 F.2d 737 (5 Cir. 1959); United States v. Key, 371 F.2d 421 (6 Cir. 1967); and United States v. Boyd, 337 F.2d 613 (4 Cir. 1964) all dealing with 21 U.S.C.A. § 331 (k); Dean Rubber Manufacturing Co. v. United States, 356 F.2d 161 (8 Cir. 1966) dealing with § 331(a); Roseman v. United States, 364 F.2d 18 (9 Cir. 1966) dealing with § 331(d). None of the cases cited by the appellant, however, deal with § 331(q) (2). They are inapposite here.

Since we have held that § 331(q) (2) does not require a showing that the drugs moved in interstate commerce, such an allegation in the information is unnecessary. Consequently, the failure to allege such movement did not deprive the district court of jurisdiction. Thus, we find Friedman v. United States, 374 F.2d 363 (8 Cir. 1967) is inapplicable. We hold that a violation of § 331(q) (2) was set forth in the information and therefore affirm the trial court.

■ The finding that the statute does not require a showing of interstate commerce does not completely dispose of appellant's attack on the information and the statute. Implicit in appellant's argument is the theory that, in order to be constitutional, the statute must require a showing of interstate commerce. Appellant refers to this issue at page 15 of his brief, where he states:

"To say *interstate commerce* is not the basis of the instant prosecution would be to ignore not only the historical origin of the Food and Drug Act, but also its derivative authority, viz., Article 1, Section 8, Clause 3 of the federal Constitution, the interstate commerce clause."

Again, at page 16 of his brief, appellant says that:

"[T]he power of Congress to legislate relative to the drug in question is predicated upon constitutional authority, namely, the Commerce Clause."

We agree that the power of Congress in this case is predicated upon the Commerce Clause. It becomes necessary to consider whether Congress has exceeded the power granted to it under the Commerce Clause by attempting to regulate certain drugs which have not moved in interstate commerce, and are strictly intrastate in nature from the time of their origin to the time of their eventual consumption. We think that appellant has raised the above issue, although he directed his main attack toward the end that § 331(q) (2) does require a showing of movement in interstate commerce. This constitutional point is only raised indirectly by appellant (see page 12, appellant's brief), but in light of the fact that appellant's liberty is at stake as a result of his conviction, we conclude that it would be improper to affirm a conviction if the statute under which the prosecution is brought is unconstitutional and that imprisonment under such circumstances would be a clear miscarriage of justice. We therefore conclude to pass on the question, which the United States by discussing it in its brief seems to

---

3. S.Rep. No. 337, to Accomp. H.R. 2, 89th Cong., 1st Sess., pp. 1895, 1896 (1965). "The bill provides increased controls over the distribution of barbiturates, amphetamines, and other drugs having a similar effect on the central nervous system. The controls are accomplished through increased record keeping and inspection requirements, *through providing for control over intrastate traffic in these drugs because of its effect on interstate traffic*, and through making possession of these drugs (other than by the user) illegal outside of the legitimate channels of commerce." (Emphasis added) This is the stated purpose of the Act.

concede has been raised and is before the court. Whether this constitutes a plain error within the meaning of Rule 52(b) Fed.R.Crim.P. is debatable. Nevertheless, the rule when applied is "to avoid a clear miscarriage of justice." Gendron v. United States, 295 F.2d 897, 902 (8 Cir. 1961). If the statute is unconstitutional, affirmance of a prison sentence against a defendant for its violation would be a clear miscarriage of justice.

██ United States v. Freeman, 275 F.Supp. 803 (N.D.Ill.1967), dealt with the constitutionality of 21 U.S.C.A. § 331(q) (2). The court concluded, as we have, that Congress does have the power to regulate the drugs in question despite the fact that they have not moved in interstate commerce. As was noted earlier, Congress has found that the widespread illicit traffic in depressant and stimulant drugs does affect interstate commerce; that the unsupervised use of the specified drugs endangers the safety of those traveling on the highway, regardless of whether they are traveling interstate or intrastate; that the use of such drugs without supervision has become a threat to public health and safety; that in order to make interstate regulation of these drugs effective it is also necessary to regulate intrastate commerce because such drugs often do not bear labels showing their origin and because in the form in which they are sold it is difficult, if not impossible, to determine their place of origin; and that interstate regulation, without intrastate regulation, would discriminate against and adversely affect interstate commerce in such drugs.

Congressional regulation of local activities which affect interstate commerce has numerous precedents in our history. In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L. Ed.2d 258 (1964) the Supreme Court upheld the constitutionality of Title II of the Civil Rights Act of 1964, one of the purposes of which was to eliminate racial discrimination as a policy among certain classes of motels. After quoting extensively from Gibbons v. Ogden, 9 Wheat.

1, 6 L.Ed. 23 (1824) the Court stated, at page 255 of its decision, that the determinative test of the exercise of Congressional power under the Commerce Clause is "whether the activity sought to be regulated is 'commerce which concerns more States than one' and has a real and substantial relation to the national interest."

Later in the opinion, the Court said that even assuming that the operation of a motel was of purely local concern, it still made no difference for " '[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.' " United States v. Women's Sportswear Mfrs. Assn., 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). To paraphrase the Supreme Court in Heart of Atlanta, supra, we need only ask two questions: (1) whether Congress had a rational basis for finding that drugs produced and consumed locally affect interstate commerce, and (2) whether the means chosen to eliminate the evil are reasonable and appropriate.

From the "Congressional Findings and Declaration of Policy", set forth above, one is able to determine the problem Congress saw facing the nation in the area of drug control and which it sought to cure. As to its size, the Committee reported:

"At the hearings last year, testimony showed that over 9 billion barbiturates and amphetamine tablets are produced annually in the United States. It is estimated that over 50 percent, or 4½ billion tablets, are distributed through illicit channels.

The human toll of drug abuse cannot be measured for it affects not only the abuser but his family and the community around him. Drug abuse is closely bound up with juvenile delinquency. It also contributes to the rising crime rate in the United States. Misuse of these drugs has contributed to the rising accidents on the highways.

The illegal traffic in drugs is enormously profitable. Barbiturates and

amphetamines having a retail value of approximately $670 sell in illicit channels for in excess of $250,000." [4]

We think that Congress had a rational basis for its findings, and that the means chosen to control that evil is reasonable. See Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

Particularly apt is language from *Darby*, supra, wherein, at page 121, 61 S.Ct. at page 460, the Court stated:

"A familiar * * * exercise of power is the regulation of intrastate transactions which are so commingled with or related to interstate commerce that all must be regulated if the interstate commerce is to be effectively controlled."

Congress has found that it is often impossible to distinguish between drugs which have traveled in interstate commerce and those which have gone exclusively in intrastate commerce. As was noted by the Court in United States v. *Freeman*, supra, 275 F.Supp. at page 805:

"An attempt to separate intrastate transactions from those in interstate commerce would apparently be a futile exercise, and would interfere in a substantial way with and obstruct the exercise of the granted power to regulate interstate commerce."

Implicit in all of these decisions is the statement found in Currin v. Wallace, 306 U.S. 1, 11, 59 S.Ct. 379, 385, 83 L.Ed. 441 (1939),

"The fact that intrastate and interstate transactions are commingled * * * does not frustrate or restrict the congressional power to protect and control what is committed to its own care."

It makes no difference whether the quantitative amount of the local activity

be classified as large or small. National Labor Relations Board v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L. Ed.2d 279 (1963); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). As was stated by Justice Black, concurring in *Heart of Atlanta*, supra, and Katzenbach v. McClung, supra, 379 U.S. at page 275, 85 S.Ct. at page 367:

"[W]e do not consider the effect on interstate commerce of only one isolated, individual, local event, without regard to the fact that this single local event when added to many others of a similar nature may impose a burden on interstate commerce * * *." (Citations omitted)

Neither is it necessary for the government to prove that in each instance the activity is related to and affects interstate commerce, for, as was stated in *Freeman*, supra, 275 F.Supp. at page 805:

"Congress has determined that each local transaction has a deleterious effect upon its efforts to regulate interstate commerce. Wickard v. Filburn, 317 U.S. 111 [63 S.Ct. 82, 87 L.Ed. 122] (1942)."

It is stated in Katzenbach v. McClung, supra,

"The activities that are beyond the reach of Congress are 'those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government.' Gibbons v. Ogden, 9 Wheat. 1, 195 [6 L.Ed. 23] (1824). This rule is as good today as it was when Chief Justice Marshall laid it down almost a century and a half ago." (379 U.S. 302, 85 S.Ct. 383)

The control of drugs is of such importance to the public health, welfare and safety of the people of the entire Nation, that the power of Congress extends even to intrastate activities which would interfere with or obstruct the granted power

4. S.Rep. No. 337, to accomp. H.R.Rep. 2, 89th Cong. 1st Sess. pp. 1895, 1896 (1965).

to regulate interstate commerce in drugs. We conclude the Congress was acting within its power and after proper investigation of and upon sufficient findings of fact relating to the illicit drug traffic when it enacted Section 331(q) (2). We find Congress did not exceed the power granted to it under the Commerce Clause of the United States Constitution. We therefore affirm the conviction of Doctor White.