**UNITED STATES of America,**

v.

**Cataldo CALEGRO DE LUTRO and Stanley Loren, Defendants.**

**No. 69 Cr. 668.**

United States District Court
S. D. New York.

Jan. 14, 1970.

---

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, by Edward M. Shaw, Asst. U. S. Atty., New York City, for the United States.

Hallisey, Goldberg & Hammer, New York City, for defendant DeLutro.

H. Elliot Wales, New York City, for defendant Loren.

MANSFIELD, District Judge.

Defendants are charged in a three-count indictment with conspiracy (18 U.S.C. § 371) to violate the so-called "loan sharking" law, 18 U.S.C. §§ 891–

894 (use of extortion to collect extensions of credit) and the "Hobbs Act," 18 U.S.C. § 1951 (obstructing commerce through use of force or violence) and with substantive violations of the foregoing statutes. They move for dismissal of the indictment, discovery of defendants' statements, striking of aliases alleged in the indictment, inspection of fingerprints, and a bill of particulars. To the extent that defendants' motion to dismiss is based upon failure of the indictment to name or identify the victims of the alleged extortion, see United States v. Agone, 302 F.Supp. 1258 (July 22, 1969) (decision by Frankel, J.), the issue has been rendered moot by the grand jury's filing of a new indictment in which the victims are named or identified.

*Motion to Dismiss Counts 1 and 2*

Title 18 U.S.C. § 894(a), the constitutionality of which is attacked by defendants, provides:

"(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."

Count 2 of the indictment charges that on May 12, 1969 defendants unlawfully participated in use of extortionate means, including threats of violence, to collect extensions of credit and to punish certain named persons for non-payment of extensions of credit. Count 1 charges a conspiracy to do so and to violate the Hobbs Act, 18 U.S.C. § 1951.

Defendants' principal contention is that § 894 must be held unconstitutional for the reason that it exceeds the power of Congress to regulate trade pursuant to the Commerce and Bankruptcy clauses of the Constitution. More specifically defendants first argue that the language of the statute is too broad and fails to limit itself to prohibi-

tion of conduct affecting interstate commerce, with the result that it prohibits not only interstate conduct but intrastate conduct, the regulation of which is reserved to the states under the Tenth Amendment. Whatever may have been thought of this argument 40 years ago, it has long since been rejected and it no longer represents a viable basis of attack. It is now well settled that Congress, in the exercise of the power granted to it by the Constitution to "regulate commerce with foreign Nations and among the several States," Constitution, Art. I, § 8, may regulate intrastate activities affecting interstate commerce even where their impact on the latter is minimal. Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); White v. United States, 399 F.2d 813 (8th Cir. 1968).

Defendants next argue that even assuming constitutional authority, there was no evidence in the record before Congress to support the conclusion that loan sharking activities affect interstate commerce. See United States v. Five Gambling Devices, 346 U.S. 441, 74 S.Ct. 190, 98 L.Ed. 179 (1953). This argument simply ignores the record.

In the introductory portion of the statute under consideration, Title II of the Consumer Credit Protection Act, 18 U.S.C. §§ 891–896, Congress made the following pertinent finding:

"(1) Organized crime is interstate and international in character. Its activities involve many billions of dollars each year. It is directly responsible for murders, willful injuries to person and property, corruption of of-

ficials, and terrorization of countless citizens. A substantial part of the income of organized crime is generated by extortionate credit transactions. * * *

 * * * * * *

"(3) Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce. Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce." Consumer Credit Protection Act, Title II, Section 201(a) (1) and (3).

Although these findings do not preclude further examination by the court, Katzenbach v. McClung, 379 U.S. 294, 85 S. Ct. 377, 13 L.Ed.2d 290 (1964), they are entitled to considerable weight, United States v. Gainey, 380 U.S. 63, 66, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), provided it appears that a rational basis underlay them. In determining the latter issue we are "not concerned with the manner in which Congress reached its factual conclusions," Maryland v. Wirtz, 392 U. S. 183, 190 n. 13, 88 S.Ct. 2017, 2021, 20 L.Ed.2d 1020 (1968), and it is sufficient if Congress acted on the basis of "common experience * * * [and] the circumstances of life as we know them." Tot v. United States, 319 U.S. 463, 468, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943).

In this age of the jet plane, superhighway and wide-area phone call, when our daily newspapers and periodicals over the past few years have repeatedly publicized large-scale "loan sharking" activities on the part of organized criminal elements, the effect on interstate commerce would appear to be too obvious to require any comment. Indeed, it is not even necessary to rely upon such widespread general knowledge. The record before Congress contains specific references to such interstate impact.[1]

 ■ Defendants' next contention is that even if Congress, in the exercise of its constitutional authority, intended to prohibit loan sharking because of its effect on interstate commerce, § 894 is fatally deficient because it fails to specify that such effect on interstate commerce constitutes an essential element of the crime. Although many federal criminal statutes do contain language incorporating the federal jurisdictional basis as an element of the crime, it follows from the broad power delegated by the Constitution to Congress to regulate intrastate transactions insofar as they are related to interstate commerce that such language is not essential. See White v. United States, 399 F.2d 813 (8th Cir. 1968); White v. United States, 395 F.2d 5 (1st Cir.1968). If the jurisdictional basis had been expressly included in the statute, the trial judge would usually be required to direct as a matter of law that it had been established, even in a case involving a wholly intrastate trans-

---

1. Conf.Rep., H.R.Conf.Rep. No. 1397, 90th Cong., 2d Sess. 28 (1968) states: "There is ample evidence that such transactions are carried on a large scale and that they have a substantial impact on interstate commerce." (U.S.Code Cong. & Admin.News 1968, pp. 2025, 2026.) On Jan. 30, 1968 Congressman Patman testified, 114 Cong.Rec. (daily ed. 499), that high interest rates affect the economy of the country adversely and that organized crime was profiting from loan sharking.
In the Senate, Senator Proxmire stated, 114 Cong.Rec. 6116 (daily ed. May 22, 1968): "Organized crime operates on a national scale. One of the principal sources of revenue of organized crime comes from loansharking. If we are to win the battle against organized crime, we must strike at their source of revenue." The Congressional Record further contains numerous references to take-overs of legitimate businesses by organized crime, and Mafia involvement in and profits from loan sharking. See 114 Cong.Rec. 502–06 (Jan. 30, 1968); 114 Cong.Rec. 1053 (daily ed. Feb. 15, 1968); 114 Cong.Rec. 4125 (daily ed. May 22, 1968); 114 Cong.Rec. 4120–22 (daily ed. May 22, 1968); 114 Cong.Rec. 6118 (daily ed. May 22, 1968).

action. In view of the existence of a proper jurisdictional basis for general regulation of loan sharking activities by Congress, the failure to refer thereto in the statute as an element of the crime, being a matter of form rather than substance, does not constitute a fatal deficiency.

Section 894 also represents a valid exercise of Congress' power to make laws with respect to bankruptcy. In enacting the statute Congress expressly found:

> "Extortionate credit transactions directly impair the effectiveness and frustrate the purposes of the laws enacted by the Congress on the subject of bankruptcies." (Consumer Credit Protection Act, Title II, Sec. 201(a) (4))

The conference report, H.R.Conf.Rep. No. 1397, 90th Cong., 2d Sess. 28 (1968), also stated:

> "In the exercise of [its bankruptcy] power, Congress has enacted the Bankruptcy Act, which confers on any debtor the statutory right, * * * to be discharged of his debts * * *. It is obvious, however, that obligations as to which there is an understanding that they may be collected by extortionate means, or which are actually so collected, are not susceptible of being 'discharged' in bankruptcy in any meaningful sense. Such transactions thus deprive the debtor of a Federal statutory right, and, at the same time defeat one of the principal purposes of the Bankruptcy Act, which is to afford insolvent persons the opportunity to make a fresh start. Thus, it seems clearly within the power of Congress to protect the Federal statutory right, and to assure that the bankruptcy laws will be carried into execution, by enacting legislation to prohibit extortionate credit transactions. * * *" U.S.Code Cong. & Admin.News 1968, p. 2025.

Further evidentiary support is found in statements made by Congressmen McDade and Poff. 114 Cong.Rec. 630 (daily ed. Jan. 31, 1968), 114 Cong.Rec. 4121 (daily ed. May 22, 1968).

Defendants' further arguments that § 894 should be declared unconstitutional for vagueness, unlawful delegation of power, and violation of freedom of contract and freedom of speech, strike us as so lacking in merit that they can be rejected summarily. Since a "threat" may be "express" or "implied", the use of the word "implicit" adds nothing of legal significance. The language of § 894 is similar to that used in other laws that have been upheld (e. g., §§ 1951, 1503, 871 *et seq.*). No state law relating to unenforceability of repayment is pointed to as unfair or unreasonable. Freedom of contract and of speech do not constitute a license to threaten, commit fraud, or practice usury.

For the foregoing reasons the motion to dismiss must be denied.

*Motions to Invalidate § 894(b) and (c) as Unconstitutional*

█ As movants themselves concede, § 894(b) and (c) deal with rules of evidence by which the Government may show that an implicit threat was made or extortionate means contemplated. The sections do not define a crime and it is not alleged that they were violated by the defendants. Nevertheless defendants seek to have them declared invalid or unconstitutional as violating the due process and confrontation clauses of the Fifth and Sixth Amendments.

Section 894(b) provides that, for the purpose of showing that an implicit threat was used as a means of collection, evidence may be introduced tending to show that one or more other extensions of credit by the defendant were, to the knowledge of the victim, collected or attempted to be collected by extortionate means or that the non-repayment thereof was punished by extortionate means. Section 894(c) authorizes the court, upon introduction of evidence tending to show the uncollectability, through civil judicial processes, of an extension of credit, or a rate of interest in excess of 45%, to allow the introduction of evi-

dence showing the defendants' reputation as to collection practices.

Movants object to subsection (b) on the ground that to permit introduction of hearsay evidence as to defendants' use of extortion to collect other loans without affording defendants the opportunity to confront and cross-examine the victim's informants goes beyond existing common law evidentiary rules governing proof of the victim's state of mind, see United States v. Kennedy, 291 F.2d 457 (2d Cir.1961). Subsection (c) is likewise objected to as violating existing common law rules of evidence which exclude evidence of a defendant's character or reputation to establish probability of guilt. See United States v. Michelson, 335 U.S. 469, 475, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. James, 208 F.2d 124 (2d Cir.1953). It is urged that in addition to its violation of existing exclusionary rules, subsection (c) would prejudice the defendants' right to a fair trial by denying them the right to confront the sources of the reputation evidence.

The attack on subsections (b) and (c) does not rise to constitutional levels or warrant a blanket declaration of invalidity, at least before the issue is properly posed at trial by the Government's offer of hearsay evidence of the type sanctioned by the statute. To do so would be to hold that Congress lacks the power to modify common law evidentiary rules in criminal cases. The law is to the contrary. Congress' power to modify such rules within certain limits has been upheld, a notable example being the statute authorizing admission of records kept in the regular course of business, 28 U.S.C. § 1732, even though the entrant or witness may not have personal knowledge of the recorded facts. United States v. Leathers, 135 F.2d 507 (2d Cir.1943).

> "The rules of evidence, however, are established not alone by the courts but by the legislature. The Congress has power to prescribe what evidence is to be received in the courts of the United States. The section under consideration is such legislation. But the due process clauses of the Fifth and Fourteenth Amendments set limits upon the power of Congress or that of a state legislature to make the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated. The question is whether, in this instance, the Act transgresses those limits.

> "The Government seems to argue that there are two alternative tests of the validity of a presumption created by statute. The first is that there be a rational connection between the facts proved and the fact presumed; the second that of comparative convenience of producing evidence of the ultimate fact. We are of opinion that these are not independent tests but that the first is controlling and the second but a corollary." (Tot v. United States, 319 U.S. 463, 467, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943))

See in accord Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

■ Applying the same principles here, the constitutionality of a statute permitting the introduction of hearsay would depend upon whether there appears to be a sufficient guarantee of trustworthiness to warrant the acceptance of the evidence in lieu of calling the original declarant, which may be impossible or at least impractical. Where such conditions are met, numerous exceptions to the hearsay rule are tolerated in criminal proceedings. If, as defendants urge, confrontation of the declarant were the inflexible standard, we would be required to reverse such long-accepted principles. Even in criminal trials a hearsay statement may, under appropriate circumstances, be inherently superior to, or at least as good as, testimony given by the declarant in person.

■ Applying the foregoing principles here, it cannot be said that character evidence is irrelevant in a criminal proceeding of the type involved. On the contrary its relevance was recognized by the Supreme Court in United States v.

Michelson, 335 U.S. 469 at 475–476, 69 S.Ct. 213, at 218–219, 93 L.Ed. 168.

"The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so over-persuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The over-riding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."

In modifying this blanket common law rule of evidence in "loan shark" prosecutions, Congress did not strip the trial judge of any discretion as to the conditions under which such evidence would be received. There may well be instances where cumulative evidence of a defendant's traits of character is sufficiently specific to warrant a strong inference that he acted on the occasion in question in accordance with his reputation as demonstrated on prior occasions, in which event the specificity and relevancy of the evidence would outweigh any confusion, prejudice or unfair surprise that might otherwise call for exclusion of such evidence.

For the foregoing reasons the motion to declare § 894(b) and (c) unconstitutional must be denied, without prejudice to defendants' right to object at trial to the admission of specific evidence offered by the Government.

*Motions to Inspect Defendants' Post-Arrest Statements and to Strike Aliases*

Since the Government has consented to both of these motions, they are granted.

*Motions for Particulars*

 The Government has consented to furnish certain information requested by defendants, including the approximate dates and places of any eavesdropping, the names of all co-conspirators known to the Government, the approxi-

mate times when and places where each of the alleged extortionate means were used or attempted, a recording of a conversation to which defendant DeLutro was a party on May 12, 1969, the extensions of credit sought to be collected, and the approximate times, places and amounts, including the names of persons to whom the alleged extortionate loans were made.

The balance of the information requested seeks evidentiary details, such as overt acts which the Government may not be required to prove, names of witnesses and the like, rather than ultimate facts required for the purpose of preparing for trial, avoiding surprise, and pleading double jeopardy. Accordingly the motion for a bill of particulars must be denied, except as consented to by the Government.

Defendants' motions are disposed of as indicated above.

It is so ordered.