Theodore A. HARRIS, Father and Next Friend of Patrick Harris, a Minor, Appellant,

v.

Richard D. SMITH, Appellee.

No. 18378.

United States Court of Appeals Eighth Circuit.

Jan. 11, 1967.

Rehearing Denied March 24, 1967.

Alfred A. Fiedler and Stephen E. Sturek, Jr., Omaha, Neb., for appellant.

L. J. Tierney, of Cassem, Tierney, Adams & Henatsch, and Martin A. Cannon, Omaha, Neb., for appellee.

Before VOGEL, Chief Judge, MATTHES, Circuit Judge, and DUNCAN, Senior District Judge.

VOGEL, Chief Judge.

Dr. Theodore Harris, appellant herein, instituted this action as father and next friend of Patrick Harris, a minor, alleging that medical treatment and malpractice by Dr. Richard D. Smith, defendant-appellee, was responsible for the amputation of his son Patrick's right arm. Negligence and malpractice were alleged in the following particulars:

"(a) In failing to administer any antibiotics, or tetanous [sic] toxoid or antitoxin.

"(b) In enclosing the compound fracture in plaster initially in a long arm cast from the elbow into the hand.

"(c) In failing to apply only a half-cast with traction on the distal fragments and the wound allowed to drain for several days until all danger of infection was under control and then doing a secondary closure.

"(d) In failing to properly clean the wound of fragments of gravel, bits of leaves, pine needles and dirt.

"(e) In failing to recognize the appearance of gas gangrene symptoms such as apprehension, swelling of the fingers and pain, fever and toxicity and to properly treat the same when he did recognize said symptoms on July 10, 1962.

"(f) In failing to x-ray the arm with the cast on, or to check on early stages of infection."

Damages were claimed for (1) pain, suffering and permanent disability in the amount of $300,000 and (2) hospital and medical expenses of $2,126.80. The case was tried to a jury, which found in favor of the defendant and judgment was entered accordingly. Motion for a new trial was denied by the District Court. This appeal followed.

On July 7, 1962, Patrick Harris, at that time fifteen years of age, fell from a tree while caddying at the Happy Hollow Country Club in Omaha, Nebraska. As a result of this fall he sustained a compound fracture of the right ulna and radius near his wrist and a dislocation of the elbow of his right arm. The record indicates that the force with which he hit the ground and the manner in which the bones of his arm were driven into the earth resulted in a particularly dirty wound which necessitated the exercise of special precaution. No attempt was made to treat the wound or set the broken arm at the country club but his arm was immobilized for transportation to Methodist Hospital in Omaha by ambulance.

Dr. Harris, learning of his son's injury, asked a colleague to recommend an orthopedic surgeon and upon this recommendation he contacted Dr. Smith. Dr. Smith first saw Patrick in the emergency room of Methodist Hospital where he was admitted on Saturday, July 7, 1962, at 10:50 a. m. Dr. Smith diagnosed Patrick's injury as a compound fracture of the right forearm with a one-inch laceration wound at the place of fracture, and a dislocated elbow. At the time of admission Patrick's temperature was 98, his pulse 88 and his respiration 20. Morphine was at that time administered for pain and arrangements were made for surgery in the early afternoon. No antitoxins or antibiotics were at this time administered to prevent infection in the wound.

Dr. Smith prepared for the surgery in the normal manner by "scrubbing" and cloaking himself in mask and gown. Patrick was prepared for the operation by nurses who shaved the hair from his arm, washed the arm with a sterilization soap and placed him under anesthetics. When Dr. Smith again saw the boy in the operating room the bones were not protruding and the wound was closed. At the operation the wound was reopened and enlarged to approximately three inches. All tissue that appeared to be damaged was removed. The bones were re-extended through the wound, scrubbed with a brush and the wound was continually irrigated to remove waste particles. The cleansing of the wound took an estimated hour and a half. Betadine

was then placed in the wound. The broken bones were reduced and the dislocated elbow was set. The wound was closed and a full circular plaster cast was applied. No provision was made for drainage from the wound by an opening in the cast, elevation of the arm, or treatment with antibiotics or antitoxins for, Dr. Smith testified, he did not believe that the use of these constituted good medical practice at this stage. Following the operation on the afternoon of July 7, 1962, Patrick's temperature was 97, his pulse 100 and his respiration 20.

It is important in this appeal that the post-operative condition of Patrick Harris during the two days preceding the amputation be carefully examined. On July 8, 1962, the hospital records indicate that Patrick experienced a marked variance of temperature in that it climbed from 97 degrees on the previous day following the operation up to a recorded 102.6 and then back to 99.2 degrees. His pulse on that day varied between a high of 110 and a low of 96. His respiration varied between a high of 24 and a low of 20. It should also be noted that during the course of the day he complained extensively of pain, that there was considerable swelling of the arm within the cast, that the fingers were warm, swollen and difficult to move, and that there was a fairly large amount of red drainage on the cast at the place of the wound. Further, the arm, which had not previously been suspended, was at this time suspended on order of Dr. Smith.

On July 9, 1962, Patrick again experienced marked variations in temperature, pulse and respiration similar to, yet more extreme than those of the prior day. His temperature varied from 99.6 degrees up to a recorded 103.4 degrees, back down to 100.6 degrees and again up to 102.6 degrees. His pulse count moved from 100 up to 160 and back to a recorded 112. Respiration count moved from a low of 20 to a high of 32. Throughout the course of the day he complained of severe pain. The hand remained swollen, warm and somewhat blue, although there was apparently still some circulation

within the hand. His arm remained elevated throughout the course of the day.

At no time during these two days were antitoxins administered to prevent the spread of infection in the wound.

On July 10, 1962, prior to the amputation, Patrick's temperature fluctuated from 100.6 degrees to 99 degrees and up to 103.6 degrees; his pulse moved from a minimum of 80 to a maximum of 130; his respiration fluctuated between 20 and 24. Through the night the patient complained of extreme pain. His fingers were swollen, warm and blue. Sometime between 7:30 and 8:00 o'clock on the morning of July 10th a diagnosis of gas gangrene was made. That afternoon about 2:00 o'clock he was taken into surgery and the lower arm and hand were amputated. The following day at his father's request Patrick was transferred to the Mayo Clinic in Rochester, Minnesota, where further amputation was found necessary. As a result the elbow and part of the upper arm were amputated.

This extended recital of evidentiary facts is deemed necessary because all of the alleged errors herein have to do with the admission or exclusion of evidence and testimony relating to Patrick's infirmity. Seven doctors testified during the course of the trial, four of whom— Dr. Harris, Dr. Smith, Dr. O'Rourke and Dr. Henderson—had actual knowledge of the aforementioned facts or were personally involved in the treatment of Patrick. The three remaining physicians, Dr. Gaenslen, Dr. Gross and Dr. Burney, testified as expert witnesses, obtaining their knowledge of the instant case from the hospital records, Exhibit 5, and the testimony of other witnesses.

I.

The first alleged error arises from the admission of opinion evidence given in response to hypothetical questions asked by the defense of Dr. Gross and Dr. Burney. The hypothetical questions and the responses thereto are somewhat different and hence each will be considered independently.

The first hypothetical question to be examined is that asked of Dr. Gross. The relevant portions and interrelated testimony appear in the record as follows:

"Q. *Dr. Smith tells us that as he saw the young man that day, which is Sunday morning, that the swelling seemed to be normal, the color of the hand seemed to be normal, he had some temperature but not too excessive, the respiration was all right, the pulse was not too excessive, the boy had some anxiety.*

"Would there be anything in that situation which you would believe would indicate to anyone that there was anything wrong?

"A. No.

\* \* \* \* \* \*

"Q. *I am trying to get this, Doctor, that Monday evening when Dr. Smith saw Patrick his temperature was fairly normal for the condition that he had, his pulse was not excessive, the color of his fingers was the same for that type of an injury that he had; that he checked to see if he was in any way toxic, and it was his opinion that he was about the same as he had been in that respect and that he had some movement, normal movement of the hand for that type of injury, and he concluded that everything was normal, there was no infection, and that outside of being a boy with fractured arm that had been reduced and a dislocated elbow that had been set, that everything was going along normally.*

"Under those circumstances would you think that would be a normal conclusion to come to with that type of situation before you?

"Mr. Fiedler: Your Honor, I object to that as attempting to ask a hypothetical question that does not include all of the facts in evidence.

"By the Court: Overruled. He may answer. You may go into it on cross-examination." (Emphasis supplied.)

■ An examination of the above-quoted testimony clearly reveals that the hypothetical questions asked of Dr. Gross were not founded as they should be upon the simple facts of the case, such as temperature, pulse, respiration, the color of the hand, swelling, pain, wound drainage, etc., but, rather, upon the opinion of Dr. Smith concerning these conditions in his patient. Dr. Smith testified that he considered the above conditions *normal* as a result of an injury of this sort and it is evident that it is upon this opinion or conclusion made by Dr. Smith that the hypothetical questions were grounded. It has long been recognized in this circuit as well as most other jurisdictions that it is improper, when asking a hypothetical question of an expert witness, to incorporate within the question being asked the opinion of other expert witnesses, for opinion upon opinion diverges much too far from the plain facts upon which all proper hypothetical questions must be grounded. As this court observed in the malpractice action of Laughlin v. Christensen, 8 Cir., 1924, 1 F.2d 215, at 219:

"\* \* \* the testimony on this point which defendant thus embodied in his hypothetical question was not testimony as to a fact, but consisted of the opinion of an expert who had very recently examined plaintiff. It is the rule that it is not allowable in asking a hypothetical question to incorporate into it the opinion of another expert. (Cases cited.)"

■■ See, also, Taylor v. Taylor, 8 Cir., 1954, 211 F.2d 794, 796; Corrigan v. United States, 9 Cir., 1936, 82 F.2d 106, 107; Annotation, 1935, 98 A.L.R. 1109, 1113–14, and A.L.R. Supplemental Decisions for 98 A.L.R. 1109. This hypothetical question asked of Dr. Gross clearly incorporated within itself the opinion of Dr. Smith and therefore comes precisely within the scope of the aforementioned cardinal rule relating to hypothetical questions. Hypothetical questions must be based upon the facts rather than upon other expert opinion. Therefore, when objection was urged that the hypothetical question did not contain all the facts, the objection should have been sustained.

The hypothetical question asked of Dr. Burney, to which objection is made, is es-

sentially the same question asked of Dr. Gross as considered above. The relevant portion of the hypothetical question asked of Dr. Burney and the interrelated testimony appear in the record as follows:

"Q. Dr. Smith then next saw the young man Monday evening, which is in the evening of the morning he bivalved the cást, and it is still July 8, 1962, and he saw him about seven o'clock in the evening, and that the evidence in this case had revealed that Patrick Harris from the time he had come into the hospital was somewhat apprehensive, he was a fairly high-strung individual, he had had a hard time keeping him in bed, and I think the father at one time testified that the young man was prancing up and down in the room and that there was some anxiety that persisted, and that on the evening of Monday, July 9, 1962, that Dr. Smith thought that the young man seemed toxic, and that he then took him into a private room and talked with him personally for some time, and that the young man answered all the questions, *talked all right, seemed to be mentally alert, and the doctor at that time checked his pulse and temperature and found that they were ordinary for the type of injury that the young man had. He checked the swelling. It was normal for the type of injury that the young man had. He checked the color of the fingers and they seemed normal for the type of injury. The capillary return was good. And then took the young man back to his room.*

"Now, would you believe that in doing this that there was anything more that Dr. Smith could or should have done other than simply continue to watch the young man?

"By the Court: Just a moment, Doctor.

"Mr. Kerr: Your Honor, I would object to that as being a hypothetical question that fails to properly qualify as a hypothetical question; it assumes facts not in evidence; fails to state all the facts that are in evidence; mis-states facts in evidence, and therefore not proper.

"By the Court: The objection will be overruled. You may cover in cross-examination any deficiencies you feel may be present in the question.

"A. *I would like to ask if you could tell me what the temperature and pulse were at that time.*

"Q. At the time the doctor saw him, Exhibit 5 [the hospital records] will show what the pulse and temperature was at the time, and you will notice there that it is marked in a red circle and that will give you the pulse and temperature at the time that Dr. Smith saw him that Monday evening in the private room.

"A. I would certainly feel that one would be concerned about—*one is always concerned about any patient who has persistent pain after a fracture and has evidence of some temperature and pulse irregularity or elevation,* but certainly all one can do is to be alert and observant, and it sounds that Dr. Smith was certainly doing this." (Emphasis supplied.)

Upon reading this hypothetical question, it is obvious that inherent in it are precisely the same fundamental defects which were in its prototype asked of Dr. Gross, in that the question was based upon the opinion of another expert, Dr. Smith, as to the condition of the patient rather than a factual recital of actual temperature, pulse, respiration, skin color, pain, swelling, etc., as well as all things Dr. Smith did or did not do. In the prior question asked of Dr. Gross, there was no attempt to remedy this fatal defect. In the instant question, Dr. Burney, himself, made an attempt at remedying the error when he asked counsel to tell him what the temperature and the pulse were at that time. He was then referred to the hospital chart with the red marking which reflects some vital information but which does not portray all the vital factual information upon which the question was based. Even insofar as the chart's reflection of variation

in temperature and pulse is concerned, when the totality of the hospital records is examined, as was done in the factual analysis set forth herein, it is evident that the chart's portrayal inaccurately reflects all highly significant oscillations of temperature and pulse. Dr. Burney's own testimony establishes that pulse and temperature irregularity, when accompanied by continuous possible fractural pain, are real causes for concern. The defective hypothetical question here under consideration which, in the first instance, was based upon the opinion of another expert as to the normalcy of the patient was not corrected by reference to a chart which did not reflect the totality of facts under consideration and inaccurately portrayed some of the vital temperature and pulse variations. As was stated in Dickerson v. Shepard Warner Elevator Co., 6 Cir., 1961, 287 F.2d 255, at 260:

> " * * * Where a hypothetical question leaves out facts in evidence which so qualify the facts included that an answer to the question would be misleading and based upon inadequate premises, objection to the question should be sustained."

Although a hypothetical question need not embrace all facts having any relationship to the issue before the court, fairness requires that it embody all plain substantial facts in evidence and be supported by evidence that is relevant and material, for otherwise the jury is given an unfair picture upon which to base its determination. See, Kale v. Douthitt, 4 Cir., 1960, 274 F.2d 476, where the court made the following statement at page 482:

> "Generally, a hypothetical question must assume all facts disclosed by the evidence material to the theory of the case as viewed from the side propounding the question. A question which assumes any material fact not supported by the evidence is inadmissible. A question which omits any material fact essential to the formation of a rational opinion is likewise incompetent. The facts upon which the expert bases his

opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture."

See, also, Fort Worth & Denver Ry. Co. v. Janski, 5 Cir., 1955, 223 F.2d 704, 706; Ranger, Inc. v. Equitable Life Assur. Soc. of U. S., 6 Cir., 1952, 196 F.2d 968, 973; Boegel v. Morse, 1960, 251 Iowa 1253, 104 N.W.2d 826, 829; Burns v. Fisher, 1957, 132 Mont. 26, 313 P.2d 1044, 1047, 67 A.L.R.2d 1; Flory v. Koltz, 1964, 176 Neb. 531, 126 N.W.2d 686, 691.

The hypothetical questions here under consideration were defective because (1) they called for expert opinion based upon previously expressed expert opinion rather than upon the plain facts, and (2) the plain facts that were adduced did not portray a fair, complete picture for the jury's consideration. When objections were urged to the hypothetical questions in the form in which they were propounded, they should have been sustained.

II.

The appellant's second claim of error arises out of the trial court's refusal to permit Dr. Harris to offer expert opinion testimony concerning the medical care and treatment of Patrick Harris. From the record it is clear that Dr. Harris was a qualified medical doctor; he attended medical school at the Medical College, University of Manitoba, from which he graduated in 1952. He served his internship in Vancouver General Hospital, Vancouver, British Columbia. He began his practice of medicine with the Canadian Indian Health Service, spending six months within the Arctic Circle and six months in the Edmonton, Alberta, Hospital. Dr. Harris began his private practice in Loon Lake, Saskatchewan, where he was a general practitioner and where he had occasion to treat fractures. From there he moved to Cooperstown, North Dakota, where he practiced for fourteen months. He then moved to Jamestown, North Dakota, where for three years he was engaged in the general practice of medicine, was on the staff of

both of the local general hospitals and was a member of the local County Medical Association. Here again he had occasion to treat fractures. Dr. Harris came to Omaha in June 1960 to take up a residency in psychiatry under a contract with the State of North Dakota whereby he was paid a stipend during the three-year period of residency by North Dakota if upon the conclusion of his psychiatric residency he would spend two years as psychiatrist in the North Dakota State Hospital. Dr. Harris and his family had been in Omaha approximately two years when his son Patrick was injured. The above-cited qualifications of Dr. Harris as an expert stand uncontradicted and unimpeached.

In the course of plaintiff's counsel's direct and redirect examination of Dr. Harris the following exchanges occurred out of which arose the claimed error resulting from the trial court's exclusion of testimony offered by Dr. Harris:

"Question by Mr. Fiedler: From your discussions with these orthopedic specialists, from the fact that you are a doctor and licensed, that you have treated fractures, and your own knowledge, do you feel then, that you have a knowledge of the standards of care and treatment of compound fractures in this community?

"Mr. Tierney: I am going to object to that, Your Honor, as no sufficient foundation.

"By the Court: He may answer 'Yes' or 'No' to the question.

"The Witness: Yes, Sir.

"Question by Mr. Fiedler: Based upon your medical experience, based upon your study of these numerous texts and journals, and based upon your study of the hospital records and charts, and based upon your personal observations of Patrick Harris, and further based upon your gathering of knowledge of the standards of care of orthopedic specialists in this community, do you have an opinion as to whether or not there was any negligence on the part of Dr. Richard D.

Smith in the care and treatment of your son, Patrick Harris?

"Mr. Tierney: Objected to * * *

"By the Court: Just answer that question 'Yes' or 'No'.

"The Witness: Yes, sir.

"Question by Mr. Fiedler: Will you state what that opinion is.

"Mr. Tierney: Now, I want to object for the reason it is hearsay, incompetent and irrelevant; no sufficient foundation laid; based on matters not in evidence; purely hearsay; calling for a conclusion of the witness; invading the province of the Court and Jury; and just incompetent.

"By the Court: *I am going to sustain the objection on the ground that this doctor has already testified that he is not in the orthopedic field, and he may not express his opinion on the field. There is not sufficient foundation. The objection will be sustained.*" (Emphasis supplied.)

On further redirect examination of Dr. Harris, his expert testimony was again excluded:

"Question by Mr. Fiedler: Is this gas gangrene peculiar only to orthopedic work or is this in general medicine that you run into this situation?

"The Witness: You may get infections with the gas gangrene bacillus complications in other wounds.

"Question: Is the prevention of wound infection universal for any kind of a doctor, general or anyone?

"Mr. Tierney: I am going to object as improper re-direct examination, incompetent, no sufficient foundation.

"By the Court: *I don't think the test is any general field or any general doctor. The objection will be sustained.*" (Emphasis supplied.)

A thorough examination of the record compels the conclusion that the trial court excluded the testimony of Dr. Harris on these points solely upon the ground that he was not an orthopedic specialist. It is a well-established principle that the testimony of a qualified

medical doctor cannot be excluded simply because he is not a specialist in a particular school of medical practice. As the court succinctly stated in Wong Ho v. Dulles, 9 Cir., 1958, 261 F.2d 456, at 460:

> "We cannot agree that Dr. Bergius was not an 'expert.' He was. 'A physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks.' The weight to be given his testimony—i. e., 'how expert is the expert?'—is another matter. That is purely a question of discretion for the trier of fact to determine." (Cases cited.)

See, also, Jenkins v. United States, 1962, 113 U.S.App.D.C. 300, 307 F.2d 637, 643–644; Sher v. DeHaven, 1952, 91 U.S.App. D.C. 257, 199 F.2d 777, 782, 36 A.L.R.2d 937; Shover v. Iowa Lutheran Hospital, 1961, 252 Iowa 706, 107 N.W.2d 85, 89; Sioux City & P. R. Co. v. Finlayson, 1884, 16 Neb. 578, 20 N.W. 860, 864; Annotation, 1928, 54 A.L.R. 860–861, and A.L.R. Supplemental Decisions for 54 A.L.R. 860. The correctness of this principle is acknowledged by the appellee:

> "The point of law under this proposition is not disputed,—but we submit that certainly Dr. Harris was not qualified so far as compound fractures such as we have here be concerned."

In a similar manner, the trial court, in its order denying motions for a new trial, attempted to reconcile its exclusion of Dr. Harris' opinion testimony with this fundamental legal principle by stating:

> " * * * The standard of care to be established concerned that of orthopedic surgeon. As a matter of fact, *eral practitioner may testify as an expert even in a specialized field of medicine if it is first established that the diagnosis or treatment is recognized as being identical both in general practice and in the specialized field of medicine.* (Cases cited.) However, it was not established in this case that the standards were the same for a general practitioner as for an orthopedic surgeon. As a matter of fact,

it was indicated by the testifying doctors that a compound fracture accompanied by a dislocated elbow is a very severe injury which does not occur often. Nor can we accept the witness's statement that he had discussed the matter with a number of orthopedic surgeons in Omaha as sufficient to qualify him as an expert in the field of orthopedic surgery. *We cannot say that Dr. Harris was competent to testify as to the field of orthopedic surgeon* [sic] *on the basis of the foundation laid in this instance.* In any case, in view of the competent and adequate testimony the plaintiff presented from other doctors who were orthopedic surgeons, we do not believe he was prejudiced by the refusal of this Court to allow his father to testify as an expert opinion witness." (Emphasis supplied.)

 In spite of this curative attempt to place the exclusion of Dr. Harris' expert testimony within an area where the trial court may exercise its discretion on admissibility—whether an expert is qualified to express an opinion on a *particular subject*—a careful reading of the record compels the conclusion that when Dr. Harris' testimony was offered it was not excluded because there was a failure to show that he had *sufficient experience* with the treatment of compound fractures, as is contended by the appellee but, rather, his testimony was excluded because, although he was a medical doctor, he was not an orthopedic specialist.

> "*I am going to sustain the objection on the ground that this doctor has already testified that he is not in the orthopedic field, and he may not express his opinion on the field.*" (Emphasis supplied.)

In an action of this gravity, we believe appellant was entitled to place into evidence the testimony of all properly qualified expert witnesses and it constituted prejudicial error for the trial court to exclude the opinion testimony of Dr. Harris. The weight to be afforded this tes-

timony was, of course, within the discretion of the jury.

 Appellee claims that in any event there was no offer of proof concerning the essence of Dr. Harris' testimony and therefore the issue is here not reviewable. Rule 43(c), Federal Rules of Civil Procedure, 28 U.S.C.A., provides specifically that an offer of proof *may* be made when objection has been sustained to a question propounded by the examining attorney. To make an offer of proof in the above circumstances would have been the proper course but a formal offer of proof is not an absolute requisite to enable the presentment of error on appeal if that error affects the substantial rights of the parties. Judge Learned Hand, in Meaney v. United States, 2 Cir., 1940, 112 F.2d 538, at 539, stated the proposition that:

> " * * * It is true that the plaintiff did not make any formal offer of proof such as Rule 43(c), Rules of Civil Procedure, provides for, but, while that would have been useful, it was not an absolute condition upon availing himself *of the error.* * * * If the testimony was competent, its exclusion probably affected 'the substantial rights of the parties'. Rule 61."

If a question is proper on its face and indicates an answer favorable to the appellant, no offer of proof is necessary. See, McGrath v. Chung Young, 9 Cir., 1951, 188 F.2d 975, 977. We believe that in the instant case not one but both of these circumstances were present; that is, that the answer affects the substantial rights of the plaintiff and that it is *proper on its face and indicates an answer favorable to the plaintiff.* We also note that a similar rule of practice is followed by Nebraska, the state in which the instant case arose and was tried. In Johnson v. Griepenstroh, 1948, 150 Neb. 126, 33 N.W.2d 549, the court, when quoting In re Estate of Johnson, 100 Neb. 791, 161 N.W. 429, stated at page 555 of 33 N.W.2d:

> " * * * 'When a question is asked that does not "indicate to the trial court the relevancy of the testi-

mony," it is not error to exclude the testimony, unless the party propounding the question informs the trial court as to the relevancy of the testimony, and an offer of proof will enable the trial court to determine whether the evidence is competent. *When the condition of record and the form of the question itself show that it is relevant and competent no offer of proof is necessary.* The many decisions of this court in regard to requiring an offer *of proof should be so understood.'* " (Emphasis supplied.)

Because of the type of question asked, no offer of proof herein was necessary under either the federal rules or the Nebraska practice. The trial court's error in excluding the expert opinion of Dr. Harris is therefore cognizable on this appeal.

### III.

 An additional ground of error, although not urged on appeal, should be noticed by this court because of its substantial effect upon the rights of the parties. It is within the discretion of this court to notice plain error in civil appeals. As the late Judge Thomas stated for this court in General Finance Loan Co. v. General Loan Co., 8 Cir., 1947, 163 F.2d 709, at 711:

> "We may, however, in our discretion consider a plain error apparent on the face of the record for the purpose of avoiding a manifest miscarriage of justice, or where the issue raised is one of public concern, even in a civil case. Kincade v. Mikles, 8 Cir., 144 F.2d 784; National Aluminate Corporation v. Permutit Co., 8 Cir., 144 F.2d 93."

See, also, Andrews v. Olin Mathieson Chemical Corp., 8 Cir., 1964, 334 F.2d 422, 428; Minneapolis, St. P. & S. S. M. R. Co. v. Metal-Matic, Inc., 8 Cir., 1963, 323 F.2d 903, 910.

The plain error of which notice must be taken herein involves the trial court's reception into evidence of Patrick Harris' hospital records for some purpose [not stated] but refusing to allow them

to go to the jury. Included in the hospital records of Patrick Harris, all labeled Exhibit 5, are photostatic copies of the admission diagnosis, authorization and release statements, admission statement, case history, physician's operative reports, operation records, pathologist diagnostic reports, radiologic diagnostic report, physician's orders and progress notes, temperature-pulse charts, and nurses' notes. From the record it is apparent that at the conclusion of the trial the hospital records were offered into evidence as follows:

"Mr. Tierney: Defendant then rests, Your Honor.

"Mr. Fiedler: Plaintiff would like to offer in evidence Exhibit 5.

"By the Court: Is there any objection?

"Mr. Tierney: Yes, Your Honor, I will object to it for the reason there is no sufficient foundation laid for much of it. I have no objection to the use of that part that contains the doctor's, Dr. Smith's notes.

"By the Court: *I think I will receive it in evidence. However, it will not go to the Jury.*" (Emphasis supplied.)

No supplemental foundation testimony was given when Exhibit 5 was finally offered into evidence but from this it cannot be assumed that qualifying evidence had not been laid during the course of the trial. Normally when hospital records are introduced under 28 U.S.C.A. § 1732, foundation is laid by the hospital librarian who testifies that such records were kept by the hospital in the regular course of business and upon their completion continuously remained in her custody. But of course this is not the only way to place hospital records into evidence if sufficient other foundation be established. It must be borne in mind that the purpose of the statutory business records exception to the hearsay rule is to facilitate the admission into evidence of hospital records, maintained during the course of a patient's treatment without requiring all persons who

made an entry upon the record to take the stand. To justify admissibility under the statute it must be established that the hospital records were made in the regular course of treatment. See Thompson v. Lillehei, 8 Cir., 1959, 273 F.2d 376, 384. This we feel was established when Dr. Smith, who, as the attending physician and surgeon, presumably had intimate personal knowledge of all the records which formed a part of Exhibit 5, identified Exhibit 5 as "a photostatic copy of the hospital records of the Nebraska Methodist Hospital concerning Patrick Harris". Further, extensive reference was made to the hospital records during the course of trial, during the examination of plaintiff's expert witness Dr. Gaenslen and the defendant's expert witness Dr. Burney. Dr. Gaenslen also formally identified Exhibit 5 as the hospital records of one Patrick Harris. The court, in Korte v. New York, N. H. & H. R. Co., 2 Cir., 1951, 191 F.2d 86, when faced with a similar foundation problem arising under 28 U.S.C.A. § 1732, observed at pages 90–91:

"It is true that no one got on the witness stand to say that a doctor commissioned to make an examination would make some sort of report of what he was employed to do. Since that formal bit is lacking in express language, though it is surely implicit in the nature of the transactions involved and is actually not questioned by defendant, must we hold the trial judge in error for making and acting under the natural inference? *The statute was designed to bring the realities of business and professional practice into the courtroom in usable form; we do not think it should be interpreted in a dryly technical way, contrary to ordinary habits and customs, to reduce sharply its obvious usefulness.*" (Emphasis supplied.)

See, also, Horton v. Moore-McCormack Lines, Inc., 2 Cir., 1964, 326 F.2d 104, 107.

We are in fundamental agreement with this analysis of the stat-

ute. Through the course of the trial both defendant and plaintiff made reference to Exhibit 5 and used it in the presentation of their respective cases. It being cumulatively apparent from the record that Exhibit 5 consisted of all of the hospital records kept in the ordinary course of the treatment of Patrick Harris at the Nebraska Methodist Hospital, there was sufficient foundation to justify their admission into evidence at the close of the trial. Hospital records admitted into evidence under 28 U.S.C.A. § 1732 must be received as a whole for, as Judge John Sanborn has observed,

> "* * * To have received the records without the pages objected to, would have been the substantial equivalent of receiving the records without their contents. * * * The medical records received in evidence, it seems to us, are the kind of records which any hospital worthy of the name would normally and necessarily keep in the regular course of its business of caring for and attempting to cure the ill and the injured. We think the medical record in its entirety was admissible under 28 U.S.C. § 1732. (Cases cited.)" Glawe v. Rulon, 8 Cir., 1960, 284 F.2d 495, at 498.

See, also, Thomas v. Hogan, 4 Cir., 1962, 308 F.2d 355, 360–361; Tucker v. Loew's Theatre & Realty Corp., 2 Cir., 1945, 149 F.2d 677, 679–680.

Exhibit 5, consisting of the entire hospital record, was therefore properly admitted into evidence but improperly kept from the jury. The hospital records are in this case the best source of precise information concerning the condition of Patrick Harris while he was under the care of Dr. Smith. Only from these records, made at the time of the infirmity, is it possible to ascertain all information concerning variations in temperature, pulse, respiration, wound drainage, swelling and hand color, as well as all precise information relating to drug administration and treatment. Since the jury was in this instance confronted with substantial contradictory expert testimony, it was essential that they have before them all the pertinent exhibits. This was denied them when the trial court specifically withheld the hospital records from the jury's consideration. Because of the importance thereof, affecting the substantial rights of the parties as it does, and because of the other errors heretofore referred to, we are of the opinion that justice requires that this case be reversed and remanded for a new trial. It will be so ordered.