Arlo OLSON, a minor, by Harland Olson, his guardian ad litem, Plaintiff,

v.

ARCTIC ENTERPRISES, INC., Defendant.

Civ. No. 4644.

United States District Court, D. North Dakota, Southeastern Division.

Oct. 17, 1972.

Wayne O. Solberg, Solberg & Stewart, Fargo, N. D., for plaintiff.

Robert M. Austin, Carroll, Cronan, Roth & Austin, Minneapolis, Minn., and Wattam, Vogel, Vogel & Peterson, Fargo, N. D., for defendant.

## MEMORANDUM OF DECISION

BENSON, Chief Judge.

This is a personal injury diversity action arising out of a snowmobile accident. The plaintiff sued the manufacturer of the snowmobile, alleging negligence in the design and manufacture of the machine, and breach of express and implied warranty. The case was tried to the Court without a jury. The Court finds the facts to be as follows.

On the 28th day of February, 1968, Harland Olson, the father and guardian ad litem of Arlo Olson, the plaintiff in this case, purchased a 1966 Model 140 D "Arctic Cat" Snowmobile. The machine was in good condition. There were no parts missing, and it had not been modified in any way.

Between February 28 and March 3, the snowmobile, described by Harland Olson as a "new toy", was in almost continuous operation, usually with a passenger aboard. In that period, Arlo rode on the machine as passenger, and also drove it. He had been on snowmobiles before and knew the importance of keeping the feet on the running board when riding as a passenger.

On the 3rd day of March, 1968, the Harland Olson family was getting ready to go to church. Harland and his son, Arlo, who were ready and waiting for the others, decided to take a ride on the snowmobile. They were dressed for church and Arlo was wearing an oxford type shoe without overshoes. With Harland driving and Arlo seated behind, holding onto Harland's waist, they headed for a lake about three hundred feet away at a speed between ten and fifteen miles per hour.

There was eighteen to twenty inches of loose snow cover on the surface of the lake, but the snow covering the trail to the lake was hard packed. They entered the area of loose snow on the surface of the lake going straight ahead. There was some sinking and rising movement of the rear of the snowmobile as it entered the loose snow, and some sway when one of the skis sank lower in the

snow than the other. These are normal movements of snowmobiles in deep snow. After traveling about twenty feet on the surface of the lake, Harland noticed that Arlo had fallen off the snowmobile to the left. He stopped immediately. Arlo was lying in the snow a few feet back and clear of the machine. The shoe on his left foot was torn out at the toe, and the foot was injured.

Arlo was taken to the hospital at Belcourt, North Dakota, and later the same day he was transferred to a hospital in Minot, North Dakota. His injury was diagnosed as a sustained and lacerated forefoot on the left on both the dorsum and plantar surface. The third toe was evulsed and badly lacerated. The great toe was lacerated, fractured, and the nail had been pulled loose. Arlo was hospitalized until April 5, 1968, and was on crutches until May 1, 1968. He suffered a twenty-five percent permanent impairment of his left foot, equivalent to eighteen percent of the left lower extremity, and seven percent of the whole person. He incurred a hospital bill in the amount of $1,373.49. On the day of the accident, he was within five days of reaching his twelfth birthday.

The injury was caused by the foot having become entangled in the rear track and sprocket mechanism of the snowmobile. The evidence is not sufficient to determine what caused the foot to become entangled, and whether Arlo's body left the machine before or after the foot became entangled.

The track of the 140 D snowmobile is a mechanical track constructed with metal cleats attached to an endless chain that runs over metal notched drive sprockets. The cleats were attached to the chain by inside and outside brackets and extended ¾″ beyond the outside edge of the chain to accommodate the outside bracket. The snowmobile was equipped with running boards on either side for foot support. The running boards were tapered so that they were wider at the front than at the rear. The lower part of the track and sprocket wheels were not shielded in the area of the rear of the snowmobile. The snowmobile was not equipped with passenger hand holds.

The "state of the art" in the design and manufacture of snowmobiles at the time the 140 D snowmobile involved in this accident was built had not advanced beyond that incorporated in the 140 D.

The defendant used reasonable care in the design of the snowmobile, and it was reasonably safe for the use for which it was intended. The plaintiff has failed to establish defendant's breach of duty or breach of warranty.

◼ On the basis of the facts herein and under the law applicable to the case, the Court concludes the plaintiff is not entitled to recover from the defendant.

The plaintiff alleges that the defendant was negligent in designing and manufacturing a snowmobile with the following alleged defects:

1. Needless utilization of a mechanical chain and sprocket drive;
2. Failure to provide adequate shielding for the track and sprocket;
3. Failure to provide hand holds for the passenger;
4. Failure to provide adequate footrests.

Plaintiff also alleges the defects rendered the snowmobile unfit for the purpose for which it was intended, which was primarily for sport, recreation and transportation of people.

◼ It is fundamental in the law that a tort-feasor is liable for the natural and proximate consequences of his act, but, unless the act complained of is the proximate cause of the injury, there is no legal liability. See 86 C.J.S. Torts § 27, p. 941.

The plaintiff failed to establish a causal connection between the alleged defects and the accident and injury. The foot became entangled and the injury resulted. Neither plaintiff nor his father could explain what caused plaintiff's foot to enter the track mechanism.

The running boards were free of snow and ice. There was no evidence that the width of the running board caused plaintiff's foot to slide off.

There was no evidence that loss of balance of the machine caused plaintiff's foot to leave the running board and enter the track.

There was no evidence that lack of hand holds on the snowmobile proximately caused the accident. Plaintiff had experience in holding onto the driver of the snowmobile for stability, and there was no evidence that he was unable to keep a secure hand hold on his father.

There was no evidence that the track or sprocket pulled the plaintiff's foot into the mechanism. There was no evidence that the metal track and sprocket assembly caused the accident. It might reasonably be inferred that a metal track and notched sprocket would cause a more serious injury than a rubber track and sprocket, but this inference is offset by testimony of the defendant's expert witness that the rubber track and sprocket assembly on late model machines would probably crush a limb if it became entangled. No other evidence was offered on the point. Obviously the absence of a shield over the rear sprocket and track assembly made it possible for a limb to become entangled. For reasons hereinafter set out, the Court finds this not to be a defect in the design.

■ From the evidence, one could conclude that if a passenger took his foot off the running board and trailed it in the snow or placed it under the running board while the machine was moving, it could become entangled in the track mechanism. If the foot remained on the running board, it would not become entangled. A finding that the alleged causation exists where no evidence was submitted thereto, and where probabilities are equal that the accident may have resulted from a cause different than the alleged defect, would be a finding based on speculation and conjecture

which cannot be upheld. *See* Beckel v. Alexander, 271 Minn. 14, 134 N.W.2d 304 (1965) at 308. In this case, the evidence leaves the question unanswered as to whether the plaintiff's acts or the alleged defects caused the accident. This Court can not create an answer.

The plaintiff also failed in his attempt to prove negligence in the design and manufacture of the machine, and also failed to prove breach of warranty.

The legal basis for liability is expressed in the Restatement of Torts as follows:

"A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design." Restatement Torts 2d § 398 (1965)

In this case the plaintiffs rely on Larsen v. General Motors Corporation, 391 F.2d 495 (8 Cir. 1968), as authority for his right to recover, stating in his brief " . . . it is unnecessary to show that the defect complained of actually caused the accident but merely that there was an unreasonable risk of injury in the event that an accident did occur. The Court in *Larsen* has recognized that automobile accidents are likely to occur and that the manufacturer has a duty to produce a product which is as safe as possible in such accidents." *Larsen* does not relieve a plaintiff of the burden of establishing a defect in the design and manufacture of a machine. The plaintiff has not carried that burden.

■ In light of the Restatement § 398 and *Larsen*, the design must not be unsafe for its intended use. The "state of the art" must be such as to permit an alternative means to accomplish the intended use, and the plaintiff must show the defendant intentionally or negligently refused to consider such alternatives. To refuse to consider the "state of the

art" as it relates to the operational aspects of a snowmobile would be to hold the manufacturer liable for merely marketing a functionable product—in effect placing absolute liability upon such manufacturer. This Court must view the alleged defect in light of the engineering standards in 1966.

The plaintiff's evidence as to the "state of the art" in 1966 consists of promotional literature showing rubber tracked snowmobiles produced by Arctic Cat and two of its competitors. However, the defendant's expert, the designer of the 140 D and a pioneer in the snowmobile industry, testified to the lack of an adequate rubber substance which would withstand the great stress of sub-zero weather, and yet provide the flexibility necessary for faster speeds. He testified that rubber tracks were considered, not for safety reasons, but for its faster speed capabilities, a condition the snowmobile market was demanding. He stated that from 1962 to 1966, Arctic Cat had experimented extensively with rubber tracks to find a reliable rubber material, and that in 1966 none of the rubber tracks were functionable, or reliable. He testified that one of the safety considerations in track design is to prevent any breakdown of the track that might strand the operator and passenger so distant from any help that they would suffer injury or death in attempting to walk to safety from where the machine had broken down, and as such the defendant stated it was deeply concerned with track reliability. The rubber tracked 141 D was produced by Arctic Cat on a limited basis while further research was conducted by Arctic and the U. S. Rubber Company to accomplish greater track reliability. None of this "state of the art" testimony was rebutted by the plaintiff, nor did he carry his burden of bringing forth affirmative evidence of the defendant's failure to consider the safety aspects of design. In fact, the evidence tends to show an active consideration of safety on the part of the defendant.

From the evidence, this Court can see no significant difference in the design of the 140 D and the most recent models of snowmobiles as that design relates to the defects alleged in this case. All of the machines have the unshielded open area by the rear sprocket and track. All have the narrow running board in the rear. The reason, as testified to by the defendant's expert, was to make a machine that was operable in snow. Under normal operation the rear of the machine sinks into the snow. It was found a wide running board at the machine's rear held the machine up "similar to the condition faced in an automobile that high centers in deep ruts". Likewise, shielding the rear portion of the track made the machine inoperable except in minimal depths of snow. Moreover, it prevented expulsion of foreign objects that came into the track and the removal of those objects presented a safety hazard to operators. Snowmobile engineers have not succeeded in designing a shield that would leave the machine operable. As snowmobile trails have become established, enabling machines to travel on hard packed snow rather than loose snow, late model machines have been lowered to some extent over the rear sprocket, thereby reducing the unshielded area. However, some models have a modification kit available which would raise the rear of the machine exposing a greater unshielded area on those machines that will be used in deep snow conditions.

It appears from the evidence that the snowmobile industry is not in agreement on the desirability of hand holds for passengers. Some machines have them; some do not. In designing the machine, it was recognized that snowmobiles would be used on terrain that would reduce stability. Safety criteria required ejection of the operator and passenger from the machine in event of tip over. Anything that prevented ejection on tip over was eliminated. Thus snowmobiles were not equipped with seatbelts or footholds, and many manufacturers elim-

inated hand holds for the same reason. The defendant's expert witness was the person who designed, developed, and built the "Polaris" and "Arctic Cat" snowmobiles. He testified that testing and experiments determined that hand holds were struck on ejection and that a person's hands could remain stuck in the hand hold rather than clearing the machine on tip over. Safety considerations required eliminating unnecessary protrusions. *See* Magnuson v. Rupp Manufacturing, Inc., 285 Minn. 32, 171 N.W. 2d 201. Present hand holds on machines are made of materials which allow a quick change of shape when released, and which materials were not available when the 140 D was built.

It has been said that a manufacturer has no legal duty to adopt or produce a product incorporating only features representing the ultimate in safety or design. Marker v. Universal Oil Products Company, 250 F.2d 603 (10th Cir. 1955).

It is ordered that judgment be entered for dismissal of the action, with costs to the defendant.