**Neil A. HOLMGREN, Individually and as Trustee for the North Dakota Workmen's Compensation Bureau, Plaintiff,**

v.

**MASSEY–FERGUSON, INC., a corporation, Defendant.**

**Civ. No. 4734.**

United States District Court,
D. North Dakota,
Southeastern Division.

July 26, 1974.

---

Odell M. Astrup, Fargo, N. D., Robert B. Ingram, Belli, Ashe, Ellison, Choulos & Lieff, San Francisco, Cal., Thomas William Malone, Albany, Ga., for plaintiff.

J. Gerald Nilles, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., Ronald R. Pawlak, Southfield, Mich., for defendant.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

This action involved an accident wherein Plaintiff, Neil A. Holmgren, became entangled in the auger of a Model #44 Massey Ferguson 4 row cornhead, which resulted in serious injuries to Plaintiff. Plaintiff brought this action for damages against defendant, Massey-Ferguson, Inc. Trial was to a jury and after plaintiff had rested, this Court granted the defendant's motion for a directed verdict of dismissal. Plaintiff has filed a timely motion for a new trial, pursuant to Rule 59(a), Federal Rules of Civil Procedure.

The Eighth Circuit has frequently noted that a motion for a new trial is addressed to the trial court's

sound discretion, within which the court is given wide latitude in determining whether such a motion should be granted. Sanden v. Mayo Clinic, 495 F.2d 221 (8th Cir. filed April 17, 1974); Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc., 466 F.2d 179 (8th Cir. 1972), cert. den. 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973); Farmers' Cooperative Elevator Association v. Strand, 382 F.2d 224 (8th Cir. 1967), cert. den. 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659.

> "Notwithstanding this broad latitude . . . there exist some boundaries to the exercise of the trial court's discretion in granting a new trial. . . ." *Fireman's Fund Insurance Co.*, 466 F.2d at 186.

> ". . . Thus, it has been held that a trial judge should not grant a new trial merely because he believes another result would be more reasonable. Nor should a new trial be granted where there is no valid or useful purpose for submitting the case to another jury. . . .

> "Regardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial results in a miscarriage of justice, the court may order a new trial, otherwise not." *Fireman's Fund Insurance Co.*, at 187 (Citations omitted).

A re-examination of the basis of plaintiff's case, the evidence presented by plaintiff, and the reasons for the directed verdict of dismissal, persuades this court that no useful purpose would be served in submitting plaintiff's action to another jury, and no miscarriage of justice has resulted in dismissal, for plaintiff, at the time he rested, had failed to establish a prima facie case of negligence or breach of warranty by defendant.

Briefly, plaintiff's evidence produced the following: On October 2, 1970, plaintiff was harvesting corn with the subject cornhead which was attached to a Model #510 Massey-Ferguson combine. At about 4:00 P.M. on that day, a corn stalk became lodged in one of the cornhead's right snapping rolls. Plaintiff stopped the combine, placing the transmission in neutral, and stepped from the combine's cab onto a railing on the rear of the cornhead and manually removed the offending cornstalk from the snapping roll without disengaging the power. Plaintiff testified that he had intended to disengage the power. Either he failed to do so or he did not pull the lever provided for disengaging the mechanism far enough, for when he ventured onto the cornhead rail, the table auger continued to turn. This was readily apparent to the plaintiff. In returning to the cab, the plaintiff's foot slipped when he attempted to step from the rail to the cab ladder, a distance of about four feet. His boot became caught in the auger mechanism and he was dragged into the auger causing injuries which resulted in the amputation of his right leg at the hip and his left leg at the knee. Plaintiff tried his action on the theories of negligence and breach of warranty.

The theories of negligence and implied warranty place the same duty upon the manufacturer of the cornhead, Massey Ferguson; namely, that the manufacturer design and manufacture the cornhead so as to make it reasonably safe for the purpose for which it was intended. Larsen v. General Motors Corporation, 391 F.2d 495 (8th Cir. 1968); Schneider v. Chrysler Motors Corporation, 401 F.2d 549 (8th Cir. 1968); Olson v. Artic Enterprises, Inc., 349 F.Supp. 761 (D.N.D.1972); Stromsodt v. Parke-Davis & Co., 257 F.Supp. 991 (D.N.D.1966); Lindenberg v. Folson, 138 N.W.2d 573 (N.D.1965). Plaintiff contended that defendant was negligent in designing and building a defective machine and placing it in the stream of commerce. Plaintiff alleged, particu-

larly, that defendant had breached the duty placed on it in producing a cornhead where (1) the slip clutch did not function, (2) the table auger was not shielded, and (3) the rear of the cornhead was not shielded.

Plaintiff called his expert witness, Dr. Robert N. McDougal, a mechanical engineer with a PHD, a professor in mechanical engineering at North Dakota State University, and a one time farmer. Dr. McDougal testified that the machine was defective in the three respects set forth above. On the matter of the slip clutch, he admitted he made no inquiry relative to the purpose of the slip clutch, but assumed the purpose was for the safety of the operator.[1] The Court will assume that the purpose of the slip clutch was for the safety of the operator. Those who had operated the combine cornhead from the time of its purchase testified that they had never seen the table auger slip clutch function. If it is assumed that it had never slipped to the time of the accident, no inference of defect could arise from that fact because there was no evidence that it had been subjected to a load sufficient to offset the torque setting. It is not possible to determine from the evidence what happened when Neil Holmgren fell into the auger. The evidence established that it was at least equally probable that a belt slipped before the load on either of the slip clutches on the cornhead reached the limit of the torque setting.

██ The cornhead had always been stored outside. Seventeen months after the accident, Dr. McDougal had the slip clutch removed and tested it. Out of the presence of the jury, he advised the Court that his testimony would be that the slip clutch failed to function, or seized, for either one of two equally probable reasons: (1) the design for tolerance was insufficient, or (2) atmospheric contamination—rusting—had caused the clutch to seize. There was no contention that atmospheric contamina-

tion could be charged to negligence of the defendant. Where either one of two equally probable causes, one of which is not the responsibility of the defendant, resulted in the injury and damages of which plaintiff complains, a prima facie case has not been established.

"In other words, if from the plaintiffs' evidence it is as probable that the injury and damage of which the plaintiff complains resulted from a cause for which the defendant is not responsible as it is that such injury and damages resulted from a cause for which the defendant would be responsible, a prima facie case of proximate cause has not been made and the plaintiff cannot recover, since plaintiff's recovery must be based upon more than mere speculation." Bismarck Baptist Church v. Wiedemann Industries, Inc., 201 N.W.2d 434 (N.D. 1972). See also United States Rubber Company v. Bauer, 319 F.2d 463 (8th Cir. 1963); Olson v. Artic Enterprises, Inc., 349 F.Supp. 761 (D.N.D. 1972); Ternes v. Farmers Union Central Exchange, 144 N.W.2d 386 (N.D. 1966).

The plaintiff did not offer any testimony on the results of Dr. McDougal's tests of the slip clutch, but Dr. McDougal expressed an opinion that the cornhead should have been equipped with a ratchet type clutch instead of a disc clutch, because the tolerance would not be nearly so critical and therefore not so subject to seizing.

The evidence was clear that the art of both types of clutches has been known for a long time. Dr. McDougal testified he has never designed either a ratchet or disc type clutch nor has he field tested either of them, nor has he read any technical journals or publications comparing cornheads equipped with ratchet type clutches with those equipped with disc clutches.

Dr. McDougal testified that the fact that the table auger and the back of the

---

1. The defendant's engineer testified its purpose was to protect the machinery from damage resulting from overload.

cornhead were not shielded was the basis for his opinion that the cornhead was not reasonably safe. He admitted this was also unsupported by any experience, study, or tests, and he did not offer a suggested design. No evidence was offered that other manufacturers in the industry shielded the back of the cornhead, and no evidence was offered that a shield could feasibly be provided and still retain the function of the machine. Dr. McDougal testified that his opinion on the closed auger was based on his comparative studies. The evidence established that the comparative studies consisted of physical observation of other machines, examination of sales brochures where they could be obtained, and conversations with operators. Dr. McDougal admitted he was aware that the design of the John Deere cornhead was changed from a closed auger to an open auger design, but he didn't know why the change had been made.

This Court held as a matter of law that the jury could attach no credence to the opinion of Dr. McDougal as his testimony as an expert had no probative value, and the defendant was entitled to have the testimony stricken. No other evidence was offered to show that the cornhead was defective. Defendant argues that the Court erred in striking the testimony of plaintiff's expert, particularly in finding Dr. McDougal unqualified to express the expert opinions tendered, and in excluding certain tests performed by him. These tests involved thrusting a boot, with a stick inserted in the boot, into a moving auger.

■ The plaintiff contends the court erred, "in holding that the only expert which could offer an opinion entitled to consideration by the jury would be an agricultural design engineer." This Court did not so hold, and in referring to the absence of an agricultural design engineer, was merely indicating the type of expert that *could* offer evidence that the cornhead was not reasonably safe for the purpose for which it was intended." It was deemed noteworthy by this Court that no qualified expert had been obtained in the two years of trial preparation. This court recognizes that simply because a particular expert is not a specialist in a particular field upon which his opinion encroaches does not bar him from expressing an opinion upon a subject commonly thought to be indigenous to that field. Moran v. Ford Motor Company, 476 F.2d 289 (8th Cir. 1973); Hill v. Gonzales, 454 F.2d 1201 (8th Cir. 1972); White v. United States, 399 F.2d 813 (8th Cir. 1968); Harris v. Smith, 372 F.2d 806 (8th Cir. 1967).

■ Generally, whether a witness is qualified to testify as an expert is within the sound discretion of the trial court. Moran v. Ford Motor Company, 476 F.2d 289 (8th Cir. 1973); White v. United States, 399 F.2d 813 (8th Cir. 1968). However, a trial court should not be unduly restrictive in ruling upon the qualifications of experts, for as stated in Hoppe v. Midwest Conveyor Co., Inc., 485 F.2d 1196, 1202 (8th Cir. 1973):

> "(a)n expert witness is called primarily to aid the trier of fact in understanding evidence which is of a highly technical nature. His testimony is appropriate when his unusual knowledge, by reason of skill, experience or education may lend meaningful insights and better comprehension of technical evidence. Here plaintiff's theory was based on dangerous design of a highly complicated piece of machinery. Liability alleged from defective design encompasses many factors not generally relevant to ordinary negligence in tort cases. The comparative design with similar and competitive machinery in the field, alternate designs and post accident modification of the machine, the frequency or infrequency of use of the same product without mishap, and the relative cost and feasibility in adopting other design, are all relevant to proof of defective design."

■ As stated in Moran v. Ford Motor Company, 476 F.2d 289 (8th Cir. 1973),

"(t)he test is whether the witness' training and experience demonstrate a knowledge of the subject matter. And practical experience as well as academic training and credentials may be the basis of qualification." at 291. (citations omitted). *See also Hoppe, Hill, White,* and *Harris.*

Only when an expert is qualified does the trier of fact have the discretion to weigh his testimony as an expert.

■ In this case, under any criteria, Dr. McDougal was not qualified to express an opinion on the defective design of the cornhead concerning shielding or slip clutches. He had no peculiar expertise in the operational or safety design of farm machinery through experience, training or education. This is exemplified by his deficiencies concerning farm machinery design. He was not an agricultural engineer and he was not a member of the National Society of Agricultural Engineers.[2] He is not a member of the National Safety Council, and he testified that he was not familiar with its publications. While the Mechanical Engineering Department teaches machine design, he does not teach machine design although he may teach design concepts, and any knowledge of machine design was gained from courses he took as a student. He is not a design engineer in any field and has had no meaningful design experience as related to agricultural machines, particularly cornheads. He has never operated a cornhead, nor designed a cornhead on any agricultural machine. He has never run any tests on the safety functions of a cornhead. Dr. McDougal testified that he has never patented an invention, admitting he would not recognize a patent if he saw one. He is not familiar with any publication relating to cornhead design, and he testified that he is not specifically familiar with any of the standards of the industry, or the state of the art, as they existed in 1969 when the cornhead was manufactured.

In *Hoppe,* a strict liability case, the Eighth Circuit reversed a directed verdict for the defendant, stating that the court was unduly restrictive in excluding the plaintiff's expert testimony. A conveyor-hoist had been installed in the plant where Hoppe was employed. The hoist arms of the machine became locked due to a breakage of an electrical wire. Hoppe was directed to open the manual control valve in order to raise the arms such that an assembly line blocked by the hoist could be cleared. The manual control valve was located directly above the arms, about ten to twelve feet from the floor. Hoppe had to crawl over a girder extending above the machine to gain access to the valve. He had no prior experience with the machine and was not familiar with its movements. When Hoppe inserted a screwdriver into a slot marked "manual override" and turned the valve, his foot was crushed in the moving parts of the machine. Plaintiff's expert opined that the location of the manual control valve was unsafe because it was located near moving parts of the machine. The court reversed, noting that the expert was an "experienced design engineer". Dr. McDougal is not a design engineer, nor experienced in design.

In *Moran,* plaintiff was injured in a car accident. Plaintiff contended that the upper ball joint of the suspension system was defective, and that its separation caused his car to veer out of control. The trial court excluded plaintiff's expert from testifying as to certain matters. The Eighth Circuit reversed the trial court's directed verdict of dismissal.

"Plaintiff called as an expert witness Robert Stungis, an owner and operator of a body and fender shop. Stun-

**2.** A post trial affidavit of Dr. McDougal asserts that he has become a member of this society, but this does not qualify him as an expert in and of itself, nor does it overcome his lack of qualification to express an opinion in this case.

gis had been in the auto repair business for eighteen years and had frequently examined wrecked cars. In doing so he had on many occasions inspected suspension systems to discover what parts were broken or worn, what had caused the damages and what pressures were exerted that might cause damage. He stated that he was familiar with the function and operation of a ball joint and that from his experience in the auto repair business he was able to recognize visible wear patterns on most automobile metal parts. Although the trial court allowed Stungis to point out wear that was readily observable, the trial judge did not permit him to testify whether the lower ball joint post was worn, whether the ball was set in the socket straight, whether the wear patterns were uniform, whether he could distinguish between a wear produced condition and one that was produced by an accident, or whether he had an opinion on how the wear occurred. The trial judge believed Stungis was 'unquestionably qualified to do repair work' but he was not 'qualified metalurgicallywise, or to demonstrate cause.' "

"In the instant case we believe Stungis possessed sufficient knowledge and practical experience to make him well qualified as an expert witness. The failure to permit his testimony resulted in prejudicial damage to plaintiff's attempt to prove causation." 476 F. 2d at 290–291.

*Moran* is distinguishable for it is well recognized that practicable experience is a good teacher. In *Moran,* the expert had frequently examined the allegedly defective part on the type of machine in question to determine whether the part had broken and the cause of the breakage. Here, the record is devoid of any evidence that Dr. McDougal has had any experience in the function of cornhead and its operational features, or safety and operational design relative to agricultural machinery, generally.

In *Hill,* plaintiff was injured when a doctor, in order to replace plaintiff's middle fingertips on her right hand with implanted prosthetic fingers, decided to make an impression of the fingers on her left hand as a guide, using a dental stone called Coecal to make the impressions. When immersing the plaintiff's fingers in the Coecal, they were burned, resulting in amputation of the middle fingers on her left hand. Plaintiff's expert, a dentist, testified that Coecal would not be suitable as an impression material on the human body because it would be too hard to remove and too dangerous. On appeal, the Eighth Circuit affirmed a jury verdict in favor of plaintiff, rejecting defendant's contention that the trial court abused its discretion in permitting a dentist to testify as to the effect of a substance in extraoral prosthetics. The court noted that plaintiff's expert had considerable experience as a prosthetic dentist, and had worked with Coecal and knew its characteristics. Again, Dr. McDougal has had no experience in designing agricultural machinery, has not worked with cornheads, and has shown no knowledge of the relevant characteristics thereof.

Finally, the following comment of *Harris* is relevant:

"In spite of this curative attempt to place the exclusion of Dr. Harris' expert testimony within an area where the trial court may exercise its discretion on admissibility—whether an expert is qualified to express an opinion on a *particular subject*—a careful reading of the record compels the conclusion that when Dr. Harris' testimony was offered it was not excluded because there was a failure to show that he had *sufficient experience* with the treatment of compound fractures, as is contended by the appellee but, rather, his testimony was excluded because, although he was a medical doctor, he was not an orthopedic specialist." 372 F.2d at 814.

This Court has found that Dr. McDougal was not qualified to express an opinion on the particular subject germane to this case for he has had no experience with the design of machinery—particularly cornheads, or any other machines or farm implements. His total design experience was the design of a implement tooth for Alloway Manufacturing Company.

■■ Another point raised in plaintiff's motion merits comment, namely that this Court failed to apply the doctrine of Larsen v. General Motors Corporation, 391 F.2d 495 (8th Cir. 1968). Presumably, this refers to the question of foreseeability as to the use of the allegedly defective machine. *Larsen* stands for the proposition that certain misuses of a product are so frequent as to be foreseeable, and that manufacturers should anticipate such misuse in designing their machines. Such frequent misuses can be labeled an "intended misuse" of the product, and where a manufacturer does not build his product in view of such "intended misuse" it may be unreasonably dangerous, or unfit, for the purpose for which the product was intended. Thus, in *Larsen* automobile accidents were so frequent as to be foreseeable, and the manufacturer was under a duty to manufacture an automobile which was not unreasonably dangerous in such circumstances. An affirmative duty is placed on manufacturers. It is undisputed that the operator's manual and a decal on the cornhead directed that the cornhead be turned off while unclogging or repairing it. Plaintiff strongly urges that defendant should have foreseen that an operator would not follow the operating instructions, and that defendant should have reasonably anticipated that an operator would disregard the manual and the warnings on the machine and would attempt to clear a clogged machine without disengaging it or turning off the engine, and do so by walking across the top of the railing on back of the cornhead. The *Larsen* rule of foreseeable misuse is not in point here. There must be evidence that such misusage of the machine in question is so frequent as to be foreseeable, as in *Larsen* where statistical and expert data was produced to show that better than half of all automobiles manufactured are involved in accidents. Here, there was no evidence in the record from which the jury could find an operator customarily unclogs a machine in the manner plaintiff did; or while the machine was operating. Plaintiff's own testimony refutes his theory of foreseeability in that plaintiff testified he intended to turn off the power before attempting to unclog the machine and thought he had done so before leaving the combine cab. Plaintiff's father testified he had told plaintiff personally to turn off the machine and plaintiff testified he was aware of his father's warning and the reasons therefor.

■■ In conclusion, there is no evidence that defendant negligently failed to design and manufacture a cornhead that met the standards of the industry and the state of the art that existed when the cornhead was placed in the stream of commerce. There is no evidence that the machine was defective in design or that there was any defect in material or workmanship. On the other hand, there is substantial evidence of contributory negligence, assumption of risk, and misuse of the product. The defendant was entitled to a directed verdict of dismissal.

It is ordered that plaintiff's motion for a new trial is denied.